STATE v. J. P. HARRIS.

(Filed 2 February, 1940.)

1. **Constitutional Law §§ 12, 13: Taxation § 1—Act providing for licensing of dry cleaners held unconstitutional as being discriminatory.**

Chapter 30, Public Laws of 1937, providing for the licensing of dry cleaners and pressers by the commission set up in the act, construed *in pari materia* with chapter 337, Public Laws of 1939, exempting from the provision of the act fourteen counties of the State, *is held* unconstitutional, whether the license fee therein imposed in addition to the license prescribed by the Revenue Act be considered a State tax or not, since it places a burden upon those engaged in the specified business in a portion of the State which is not imposed upon those engaged in the same business in other parts of the State without any reasonable basis of classification, and therefore discriminates within the class and accords a privilege and immunity to some not accorded to others, Constitution of North Carolina, Art. V, sec. 3; Art. I, sec. 7; Art. I, sec. 17.

2. **Statutes § 5a—**

A statute providing for the licensing of those engaged in a particular business or profession must be construed *in pari materia* with a later statute exempting designated counties from the act, in determining whether the statute is unconstitutional as being discriminatory.

3. **Constitutional Law § 4c—Delegation of power to commission in licensing dry cleaners held unconstitutional.**

Chapter 30, Public Laws of 1937, as amended by chapter 337, Public Laws of 1939, providing for the licensing of those engaged in the business of dry cleaning by the commission set up in the act, *is held* an unconstitutional delegation of legislative authority, in that the act fails to set up the standards or provide reasonable limitations to guide the administrative board in admitting or excluding persons from the business, but leaves such power in the unlimited discretion of the administrative board.

4. **Constitutional Law § 8—Extent of police power in regulating businesses and occupations.**

While the Legislature, in the exercise of the State police power, may protect the public against incapacity, fraud and oppression by establishing standards of personal fitness and requiring the examination and licensing of those desiring to engage in the learned professions and occupations requiring scientific or technical knowledge or skill, or which involve a trust relationship with the public, it may not impose such restrictions upon those wishing to engage in the ordinary trades or occupations which are harmless in themselves, since the right to choose and pursue a means of livelihood is a property right and a personal liberty guaranteed by the Constitution, which right may be interfered with only when necessary to the protection of the·public safety or welfare. Constitution of North Carolina, Art. I, sec. 1; Art. I, sec. 17.

**5. Same—**

The power of the Legislature to impose prohibitive regulations on those seeking to engage in a business or occupation does not include every business or occupation "clothed with a public interest," since this term in its broadest meaning includes all businesses and occupations, but the right to impose such regulations is confined to those businesses or occupations which by reason of some intrinsic distinguishing feature, or the manner in which they are ordinarily conducted, may produce substantial injury to the public peace, health, or welfare, if unregulated.

**6. Same: Constitutional Law § 6b—Expediency of legislation within constitutional limitations is a matter for the General Assembly; whether statute is within those limitations is for the courts.**

Whether a particular business or occupation should be regulated is not merely a question of public policy within the exclusive province of the Legislature which is not reviewable by the courts, but it is for the courts to determine whether a particular business or occupation bears such substantial relationship to the public peace, health, or welfare as to bring its regulation within the State police power, and the Legislature may not preclude judicial review by a fact-finding declaration that the regulation sought to be imposed is necessary in the public interest.

**7. Constitutional Law § 8—**

The power of the Legislature to impose restrictions preventing persons from engaging in particular businesses or occupations is much more limited than its power to impose purely regulative restrictions on those engaged therein.

**8. Same—Legislature may not prescribe prohibitive regulations upon business of cleaning and pressing.**

The business of operating cleaning and pressing plants does not afford any peculiar opportunities for fraud, require scientific or technical training, or involve any exceptional dangers to those engaged therein or to the public, and therefore it is not a business or occupation having such substantial relationship to public peace, health, or welfare as to bring it within the police power of the Legislature to impose prohibitive regulations upon those desiring to engage therein.

**9. Constitutional Law § 12—Act imposing restrictive regulations on cleaning and pressing business is unconstitutional as creating monopoly.**

Since the Legislature is without authority in the exercise of the police power to regulate those engaged in the business of operating cleaning and pressing plants, the provision of chapter 30, Public Laws of 1937, as amended by chapter 337, Public Laws of 1939, delegating power to the commission set up by the act to impose prohibitive regulations upon those desiring to engage in the business is unconstitutional as creating a monopoly. Constitution of North Carolina, Art. I, sec. 31.

**10. Constitutional Law § 3a—**

The Constitution must be construed in the light of its history, Art. I, sec. 29, and must be liberally construed in aid of progress, but a liberal construction is especially required in interpreting those provisions safeguarding individual liberty.

**11. Constitutional Law § 8—**

Historically and fundamentally the constitutional guaranties of individual liberty protect the individual in the selection and pursuit of the ordinary occupations against the unwarranted invocation of the police power.

**12. Constitutional Law § 6b—**

While the courts will not declare an act of the Legislature unconstitutional unless it is clearly so, when it clearly appears upon the facts presented that an act of the Legislature clearly violates the restrictions placed upon it by the fundamental law, it is the solemn duty of the court to uphold the Constitution and declare the statute void.

STACY, C. J., concurs in result.

DEVIN, J., concurring.

APPEAL by defendant from *Bone, J.,* at June Term, 1939, of VANCE.

This prosecution was begun by a warrant in the municipal court in the city of Henderson, whence, from a judgment of guilty, the defendant appealed to the Superior Court of Vance County, where the case was heard before Judge Bone upon the original warrant.

The warrant charged the defendant with engaging in the business of dry cleaning without first having procured a license so to do, in violation of chapter 30, Public Laws' of 1937, as amended by chapter 337, Public Laws of 1939. The license referred to in the warrant was not that required of dry cleaners under the Revenue Act, but was a license authorized to be issued by the State Dry Cleaners Commission, created by section 2 of the statute above cited. The indictment is under sections 5 and 7 of the act, to which more specific reference is made below.

On the trial the defendant admitted that he was engaged in the business defined in the statute, but denied that he was guilty of any offense. The statute, he contends, is unconstitutional and void in a number of particulars discussed in the opinion, but chiefly because it interferes with his right of choice and pursuit of one of the innocuous ordinary callings of life in his endeavor to earn a livelihood.

For convenience in discussion we refer to the following provisions of the law:

Among the definitions in section 1, we find the following:

"a. 'State Dry Cleaners Commission' means the State agency created by this act for the dry cleaning, pressing, and/or dyeing business.

"b. 'Cleaning and dyeing business' includes any place or vehicle where the services of dry cleaning, wet cleaning as a process incidental to dry cleaning, dyeing, spotting, and/or finishing any fabric is rendered for hire, or is sold, resold or offered for sale or resale; and also includes the acceptance of any clothing or other fabric to be dry cleaned, dyed and/or pressed, and where said work is actually done and performed by other parties than those accepting it.

"c. 'Pressing' means the pressing of clothes or other fabric by whatever manner used; and shall include those persons, associations of persons, firms or corporations who accept clothes or other fabric for pressing, when the actual pressing is done and performed by other parties.

"d. 'Person' means any person, firm, corporation or association.

"e. 'Retail outlet' includes any establishment or vehicle where dry cleaning, dyeing, and/or pressing service is sold, or offered for sale, directly to the consumer, but where none of the processes of dry cleaning, dyeing and/or pressing is actually performed by such retail outlets and where the retail outlets are not owned or controlled by a retail or wholesale processing establishment.

"f. 'Press shop' includes any dry cleaning, dyeing and/or pressing establishment owning or having pressing equipment for the purpose of pressing clothes or other fabrics by whatever manner used, but where the actual process of dry cleaning and/or dyeing is not performed on the premises but is contracted out to a wholesale plant.

"g. 'Retail plant' includes any person, firm, corporation or association operating a cleaning and/or dyeing establishment performing dry cleaning, dyeing and pressing for sale directly to the consumer."

The act proceeds to create, for the business thus defined, a commission to be known as the "State Dry Cleaners Commission." The commission consists of five members, "three of whom shall have been engaged in the dry cleaning, dyeing and/or pressing business in the State of North Carolina for at least five years next preceding his appointment, and two of whom shall not be connected with said business but shall be from the public at large." The members of the commission are to receive $5.00 a day while attending commission meetings and necessary traveling expenses. The commission elects its chairman and vice chairman, and adopts rules and by-laws for its organization and proceeding and adopts and uses the seal. It is further authorized and empowered to "incur any and all expenses deemed necessary by it for the administration and enforcement of this act, and to appoint a secretary who need not be a member of the commission, and such other clerks, inspectors and other assistants as it may deem necessary for the administration and enforcement of this act, and fix their duties, compensation, and terms of service, as well as the employment of such lawyers as may be approved by the Attorneys-General, all of which shall be paid out of the funds collected by the commission as provided in this act."

We quote section 3 in full: "Sec. 3. The functions, duties and powers of the 'State Cleaners Commission' shall be as follows:

"(1) To adopt and promulgate rules and regulations as may be necessary to control and regulate the dry cleaning, dyeing and/or pressing business in the following particulars:

"a. Identification to the public of all persons, firms, corporations or associations licensed by the commission to engage in said businesses, as well as their agents or representatives.

"b. Enforcement of existing fire, sanitation and labor laws where applicable to the industry, and all other laws applicable to the industry now on the statute books of North Carolina.

"c. Prohibit false or misleading statements, advertisements or guaranties either in form or content.

"d. Form of application required by commission for license and form of license to be issued by commission.

"e. Require examination of persons not entitled to have issued to them a license as provided in this act, such examination to cover subjects deemed necessary to promote the public health, safety and welfare of the people of the State of North Carolina.

"(2) To grant licenses to conduct the business of dry cleaning, dyeing and/or pressing to persons, firms, corporations, or associations in accordance with the provisions of this act and the rules and regulations of the commission. This commission may decline to grant a license, or may suspend or revoke a license already granted, after due notice and after hearing, on the grounds of any violation of the provisions of this act or the rules and regulations promulgated by said commission, not in conflict with the provisions of this act: Provided, however, that any party accused shall have the right to appeal from the decision of the commission, in the event of a refusal to grant or the suspension or revocation of any license, to the Superior Court of the county in which the place of business of the accused party is located. Such appeal shall operate as a *supersedeas* with respect to decision or ruling of said commission in the refusal to grant or the revocation or suspension of such license: Provided that, pending appeal, the accused party shall execute a bond in the sum of five hundred dollars ($500.00) before the clerk of the court in which the appeal is pending, the surety to be approved by the clerk of said court and conditioned not to violate any of the provisions of this act.

"(3) To act, for the purpose of this act, as a competent authority in connection with the matters pertinent thereto."

Section 5 of the act provides as follows: "Sec. 5. No person, firm, corporation or association shall engage in the business of dry cleaning, dyeing and/or pressing, as herein defined, within the State of North Carolina without first obtaining a license therefor from the said commission, which said license shall be valid for a period of one year and no more, unless sooner revoked or suspended by said commission under the provisions of this act." Applicable to defendant's business, as designated in this section, was $25.00 for license as "retail plant."

Section 7 provides: "Except pending an appeal, as hereinbefore provided, any person who shall engage in the business of dry cleaning, dyeing and/or pressing, as herein defined, without first having secured a license or certificate from said commission so to do, or who shall continue to do the business of dry cleaning, dyeing and/or pressing after the suspension or revocation of a license issued by the commission, shall be guilty of a misdemeanor under the laws of the State of North Carolina, and upon conviction thereof shall be punished by a fine of not less than ten dollars, nor exceeding one hundred dollars, and each day during which this violation shall continue shall be deemed a separate offense."

Section 8 reads as follows: "Licenses in this act shall be imposed as an additional State license fee for the privilege of carrying on the business, exercising the privilege, or doing the acts named herein, and nothing in this act shall be construed to relieve any person, firm, corporation, or association of persons from the payment of the fee prescribed under section five hereof."

The provisions of the Constitution on which defendant relies are reproduced for convenient reference:

"Article I, section 1: That we hold it to be self-evident that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the enjoyment of the fruits of their own labors, and the pursuit of happiness.

"Article I, section 17: No person ought to be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, but by the law of the land.

"Article I, section 29: A frequent recurrence to the fundamental principles is absolutely necessary to preserve the blessings of liberty.

"Article I, section 31: Perpetuities and monopolies are contrary to the genius of a free state and ought not be allowed."

*Attorney-General McMullan and John W. Caffey (amicus curiæ) for the State, appellee.*

*Gholson & Gholson and Ira Julian for defendant, appellant.*

SEAWELL, J. Defendant's appeal raises questions of public policy as well as of law. We are concerned with the law, of course, but matters of public policy which began long before our time, and which may be found to have underwritten the fundamental laws we are asked to apply, cannot be disregarded in their interpretation.

Statutes regulating trades and occupations by the delegation of governmental power to boards and commissions formed largely of the groups affected, intended primarily to control the personnel of the business, have

become so common as to affect progressively and importantly the social and economic life of the State. A large number of laws of that character may be listed which not only regulate but organize into autonomous corporations occupations ranging from the learned professions to the ordinary trades. U. N. C. Law Review, Vol. 17, p. 1.

No independent administrative supervision is provided over these organizations. No report of their activities is made to any responsible branch of the government. No audit is made by the State, except where items may incidentally affect the State Treasury. These matters are left to internal control. The organizations are, so to speak, legislatively launched and put on their own.

The stage of internal protest has been reached. In marginal cases controversies in the courts have arisen as to whether the organization has captured a sufficient *quanlum* of public purpose to operate as an agency of the government, or whether the police power of the State, ostensibly exercised for a public purpose, is not really farmed out to a private group to be used in narrowing the field of competition, or in aid of exploitation by creating remunerative positions in administration. *Roach v. Durham,* 204 N. C., 587, 169 S. E., 149; *S. v. Lawrence,* 213 N. C., 674, 197 S. E., 586. Without the aid of the statute these groups would be mere trade guilds, or voluntary business associations; with it they become State agencies, retaining, however, as far as possible, distinctive guild features. An exclusive self-governing status is achieved by the device of securing a majority membership on the administrative boards or commissions, and in aid of this the power of the State is heavily invoked by way of prosecution in the criminal courts of those who are unable to secure the approval of the board and obtain license to engage in the occupation.

It is this power of exclusion of fellow workers in the same field that gives to the subject its social significance, and invites our most serious consideration of the constitutional guaranties of personal liberty and individual right called to our attention.

The statute is meager in its expression of purpose in this regard. But the implication conveyed in the power to "examine those who ought not to be admitted," and to make rules and regulations in the interest of the public health, safety, and welfare in connection with such examinations, supports the suggestions in defendant's brief and argument that it was the purpose of the statute to empower the commission to apply standards of educational and moral fitness to those who desire to choose and carry on the business, occupation, or trade—however it may be called. Indeed, if that is not its purpose, we fail to find anything else in the statute in the nature of a public purpose which would necessarily preserve the organization created as a State agency.

The statute before us seems to overshoot the mark in several respects: In the discrimination produced by its territorial limitations; in the attempted delegation of the legislative function to create standards, and its failure to fix limits within which the discretion of the commission may be exercised; and, in the more fundamental respect of its invasion of personal liberty and the freedom to choose and pursue one of the ordinary harmless callings of life—a right which we conceive to be guaranteed by the Constitution.

1. Reference to section 8 of the statute shows that the license issued by the commission is not on a parity with the license usually issued by trade or professional organizations of this kind created as State agencies. The fee charged is imposed as an *"additional State license fee for the privilege of carrying on the business, exercising the privilege, or doing the acts named,"* and it is expressly stated that the payment of the license fee and the issuing of the license under the Revenue Act shall not "relieve any person, firm, corporation, or association of persons from the payment of the fee prescribed under section five hereof." In close analogy to the revenue tax, the charge is graduated according to the population of the town in which the business is carried on. Any departure from that analogy may be found in section 6, which provides an immediate expropriation of the money covered into the treasury to the use of the commission in the enforcement of the act, the only apparent items of expenses being the per diem of the commission, the salaries of officers, and the salary or fees of attorneys selected by the board. Whether such a method of dealing with State funds is permissible, we need not now discuss.

The Constitution, Article V, section 3, requires that "the power of taxation shall be exercised in a just and equitable manner." It cannot be successfully maintained that a tax which is levied on a part of the citizens of the State for the privilege of engaging in a business is equitably levied when a large number of the counties of the State are not included and citizens therein engaged in a like business are left immune from the tax. See 1939 amendment, excluding 14 counties.

But whether we regard the imposition of the license fee as a State tax or otherwise, any law which, purporting to operate on a particular class, places upon those engaged in the business in a portion of the State a burden for the privilege which is exercised freely and without additional charge by those engaged in the business in other parts of the State is arbitrary in classification because it discriminates *within* the class orginally selected and extends to the latter a privilege and immunity not accorded to those who must, under the law, pay the additional exaction or quit the business. Constitution, Article I, section 7; *Simonton v. Lanier,* 71 N. C., 498, 503; *Plott Co. v. Ferguson,* 202 N. C., 446,

163 S. E., 688; *S. v. Fowler,* 193 N. C., 290; *Edgerton v. Hood,* 205 N. C., 816, 172 S. E., 481; *Frazier v. Shelton,* 320 Ill., 253, 150 N. E., 696, 43 A. L. R., 1086. The imposition of local taxes on professions and trades is another matter. *State ex rel. Wooldridge v. Morehead,* 100 Neb., 864, 161 N. W., 569.

As stated, the 1939 amendment to the 1937 act above quoted exempts certain counties, fourteen in number, from the operation of the general act. If these two acts are construed *in pari materia,* it leaves the combined legislation clearly open to the objection of unlawful discrimination in the respect mentioned.

The exception made by the 1939 amendment is important, material, and inseparable, and leaves no room to inquire *quo animo* it was made. We can neither cancel the exception nor free the rest of the statute from its unconstitutional taint. *Springfield Gas & Electric Co. v. Springfield,* 292 Ill., 236, 126 N. E., 739, 18 A. L. R., 929, Aff. 257 U. S., 66, 66 L. Ed., 131; *Dorchy v. Kansas,* 264 U. S., 286, 68 L. Ed., 686; 11 Am. Jur., p. 843, note 20.

2. The statute authorizes the commission (sections 3 [1] [e]), to "require examination of persons not entitled to have issued to them a license as provided in this act, such examination to cover subjects deemed necessary to promote the public health, safety, and welfare of the people of the State of North Carolina." Subsection (2) of this section provides for the suspension or revocation of licenses, after notice and hearing, "on the grounds of any violation of the provisions of this act or the rules and regulations promulgated by said commission not in conflict with this act," and provides the right of appeal upon such suspension and revocation. Thus, an unlimited discretion is given to the commission to set up standards of their own for admission to the business of "dry cleaning and/or pressing," according to whatever rules or regulations they may conceive to be related to the "public health, safety, and welfare of the people."

In licensing those who desire to engage in professions or occupations such as may be proper subjects of such regulation, the Legislature may confer upon executive officers or bodies the power of granting or refusing to license persons to enter such trades or professions only when it has prescribed a sufficient standard for their guidance. 16 C. J. S., p. 373, and cases cited. Where such a power is left to the unlimited discretion of a board, to be exercised without the guide of legislative standards, the statute is not only discriminatory but must be regarded as an attempted delegation of the legislative function offensive both to the State and the Federal Constitution. *Yick Wo v. Hopkins,* 118 U. S., 356, 30 L. Ed., 220; *Thomas v. Mills,* 117 Ohio State, 114, 157 N. E., 488, 54 A. L. R.,

1220; *J. W. Hampton, Jr. & Co. v. United States,* 276 U. S., 394, 72 L. Ed., 624; *People v. Monterey Fish Products Co.,* 195 Calif., 548, 234 P., 398, 38 A. L. R., 1186; *Panama Refining Co. v. Ryan,* 293 U. S., 388, 432, 79 L. Ed., 446; *A. L. A. Schechter Poultry Corp. v. United States,* 295 U. S., 495, 79 L. Ed., 1570, 97 A. L. R., 947; *Durham Provision Co. v. Daves,* 190 N. C., 7, 128 S. E., 593.

While the power to make rules and regulations to carry into effect the laws confided to them for administration is often given to administrative bodies, and while in instances there may be some doubt as to whether the proposed regulation is legislative in character or in pursuance of a delegable power, it is clear that in a statute of this kind, giving the important power of admitting or excluding persons from a business, trade, or profession, only the Legislature can create the standards and provide the reasonable limits within which the power must be exercised. 11 Am. Jur., p. 947, sec. 234, note 3; Annotation: 12 A. L. R., 1436, 54 A. L. R., 1105, 92 A. L. R., 403.

But we do not mean to say that it was within the power of the Legislature itself to invoke the police power and set up standards of the kind suggested which might exclude persons from the ordinary non-professional and non-skilled occupations which, neither inherently nor in the ordinary manner of their conduct, present a menace to the public welfare. It is only necessary to say in this connection that if the Legislature had the power, the attempt to delegate it to this commission in the manner attempted is not consistent with constitutional limitations.

3. It will simplify discussion if we bear in mind that the controversy in this case does not concern the propriety of minor regulations of business and occupations which may be, and are, imposed generally on the principle *sic utere tuo ut alienum non laedas,* or to the still broader field of regulation under the police power which does not involve the question of exclusion from the business, trade, or occupation made the subject of regulation. There is a great body of decision upon that subject altogether too general for satisfactory application to the question before us. Appellant challenges the power of the Legislature to impose or authorize the imposition of standards such as are contemplated in the law under review which might exclude him from one of the ordinary callings of life on the ground of educational or moral unfitness or for the want of technical, scientific skill and knowledge. He refers to the provisions of the Constitution above quoted, and claims that they should protect him in the choice and pursuit of the occupation with which this controversy is concerned.

It is not contended, of course, that these provisions of the Constitution confer upon any person the absolute right to choose and pursue any occupation he pleases, regardless of the public interest. The Legislature

may, through appropriate laws, protect the public against incapacity, fraud, and oppression where, from the nature of the business or occupation or the manner of its conduct, the natural consequence may be injurious to the public welfare. 11 Am. Jur., p. 1032. And in the exercise of this power it is well established that standards of personal fitness may be created and enforced by laws requiring the examination and licensing of those desiring to engage in the learned professions, and in occupations requiring scientific or technical knowledge and skill, some of which bring about a relation of trust or confidence between those who practice the trades or occupations and the clientele they serve. *In re Applicants for License,* 143 N. C., 1, 55 S. E., 635; *S. v. Van Doran,* 109 N. C., 864, 14 S. E., 32; *S. v. Call,* 121 N. C., 643, 28 S. E., 517; *S. v. Hicks,* 143 N. C., 689, 57 S. E., 441; *S. v. Siler,* 169 N. C., 314, 84 S. E., 1015; *Lambert v. Yellowbey,* 272 U. S., 581, 71 L. Ed., 422, 49 A. L. R., 575; *Louisiana State Med. Examiners v. Fife,* 162 La., 681, 111 So., 58, 54 A. L. R., 594, Aff. 274 U. S., 720, 71 L. Ed., 1324; *State ex rel. Marshall v. District Ct.,* 50 Montana, 289, 146 P., 743; *State v. Wood,* 51 S. D., 485, 215 N. W., 487, 54 A. L. R., 719; Annotation, 55 A. L. R., 303. At the other end of the occupational scale are the ordinary trades and occupations, harmless in themselves, in many of which men have engaged immemorially as a matter of common right, as to which it is uniformly held such standards may not be applied. *Smith v. Texas,* 233 U. S., 630, 58 L. Ed., 1129; *Bessette v. People,* 193 Ill., 334, 62 N. E., 215; *Dasch v. Jackson,* 176 Md., 251, 183 A., 534. Somewhere between these extremes the slendering thread of police authority must come to an end, and constitutional guaranties of personal liberty must supervene.

On the factual situation presented in this case we are of the opinion that the occupation in which appellant desires to engage belongs to the latter class and that he is within the protection of constitutional guaranties in its pursuit. The exigencies of decision in this case do not lead us far from a consideration of the character of the business or occupation itself, the probability, if any, of injury to the public welfare for lack of regulation, and the appropriateness of the drastic method of exclusion proposed as a means of preventing such harm to the public. But, in a large part, the argument has been addressed to the theory that the trend of recent decisions adopting a more liberal attitude toward regulation of business under the police power has largely reduced the case before us to a question of mere expediency in the enactment of the statute, which is a matter within the sound judgment of the Legislature and unreviewable by the courts. It is insisted that the business is "clothed with a public interest," and it is thought that there is thus provided a smooth path for legislative action without imbrications due to constitutional guaranties. The argument is not without a suggestion that the Court should yield to

the Legislature the ultimate determination of the relative importance of the social interests involved in maintaining or overruling applicable constitutional guaranties.

It is the fault of the argument, not of its candid restatement, if it falters at critical points. Under it there is not a calling or trade, however simple and harmless, that may not be preëmpted and monopolized by the first group that stakes out its claim and raises over the camp the "keep-off sign." If the Court should adopt a theory of that sort it cannot thereafter hope to protect the rights of any man under these constitutional provisions from the grossest aggression.

Those who are versed in the history of this expression ("clothed with a public interest") will understand our disinclination to make the rights either of society or the individual to depend on a play upon words. *Tyson & Bro.—United Theatre Ticket Office v. Banton,* 273 U. S., 418, 71 L. Ed., 718, 58 A. L. R., 1236. There are many social and public interests which logically form no basis for police interference with private business or for withdrawing the protection of constitutional guaranties. Society is always interested in the trades and occupations which underlie it; there is a social interest arising from the mutuality of patronage and service; and there are many situations in the social complex that may create a desire on the part of one group to improve the conditions of contact and pressure with another, none of which as social or public interest is comparable with the importance of the social interest involved in the maintenance of personal liberty guaranteed by the Constitution. *Tyson & Bro.—United Theatre Ticket Office v. Banton, supra; Ribnik v. McBride,* 277 U. S., 350, 72 L. Ed., 913, 56 A. L. R., 1327. Compare: *Louisville & N. R. Co. v. Kentucky,* 161 U. S., 677, 40 L. Ed., 849; *Munn v. Illinois,* 94 U. S., 113, 24 L. Ed., 77; *Chas. Wolff Packing Co. v. Court of Industrial Relations,* 262 U. S., 522, 67 L. Ed., 1103, 27 A. L. R., 1280.

*Nebbia v. New York,* 291 U. S., 502, 78 L. Ed., 940, upon which the prosecution seems to lean rather heavily, deals with the suggested test—"whether the business is clothed or affected with a public interest"—and while it recognizes the impracticality of the formula, the technique employed leaves us in doubt whether the Court intended to dismiss it altogether—through the process of benevolent dispersion—and adopt a new liberalism toward governmental control of business, or to stick to the formula in a much expanded sense and give to the new adjustment between social demands and constitutional restraint the color of historic authenticity. Annotation: 119 A. L. R., 985, 986.

*Miami Laundry Co. et al. v. Florida Dry Cleaning and Laundry Board et al.,* 183 So., 759, 119 A. L. R., 956, another cited case, also uses the touchstone "clothed with a public interest" and apparently

regards the validity of police regulation as deriving its sanction from the formula.

Neither of these cases deals with the question of excluding persons from the occupations which were the subject of regulation. Whatever importance they may have in the general field affected by the decisions, the generalizations reached are too remote to control decision upon the more fundamental issues raised by the facts in the case at bar.

The constitutional provisions under consideration are categorically directed to restraint of the police power in its attempted exercise in the respects named. They have a direct and special relation to the choice and pursuit of an occupation—both as a property right and as a matter of personal liberty. Their scope and effect upon proposed legislation in this field must be left with the Court, or the guaranties might as well never have been written into the Constitution, and all the struggle and achievement which they represent is frustrated.

The mere expediency of legislation is a matter for the Legislature, when it is acting entirely within constitutional limitations, but whether it is so acting is a matter for the courts, and more especially legislative determinations in this field are subject to review. *S. v. Williams,* 146 N. C., 618, 61 S. E., 61; *Sterling v. Constantin,* 287 U. S., 378, 77 L. Ed., 375. We quote from 11 Am. Jur., p. 1060: "The determination of what businesses are affected with a public interest is primarily for the Legislature. It must be considered, however, that in spite of the fact that it is entitled to great respect, a mere declaration by the Legislature that a business is affected with a public interest is not conclusive of the question whether its attempted regulation on that ground is justified. The matter is one which is always open to judicial inquiry. Private business may not be regulated or converted into public business by legislative fiat." *Tyson & Bro.—United Theatre Ticket Office v. Banton, supra; Hirsh v. Block,* 50 App. D. C., 56, 267 F., 614, 11 A. L. R., 1238; *Wolf v. Fuller,* 87 N. H., 64, 174 Atl., 193, 94 A. L. R., 1067. The Legislature cannot, by preamble or fact-finding declaration, attribute to a business or occupation a character which it does not have according to common knowledge and experience and thus withdraw the legislation from judicial review. *Hoblitzel v. Jenkins,* 204 Ky., 122, 263 S. W., 764; *Chas. Wolff Packing Co. v. Court of Industrial Relations, supra; MacRae v. Fayetteville,* 198 N. C., 51, 150 S. E., 810; *Otis v. Parker,* 187 U. S., 606, 47 L. Ed., 323.

We think, on practical analysis of cases presented, the rule will still hold good that regulation of a business or occupation under the police power must be based on some distinguishing feature in the business itself or the manner in which it is ordinarily conducted, the natural and

probable consequence of which, if unregulated, is to produce substantial injury to the public peace, health, or welfare.   When such classifications are made, the Court will pass on their reasonableness and determine as to the validity of the legislation.

But the power to regulate a business or occupation does not necessarily include the power to exclude persons from engaging in it. *Replogle v. City of Little Rock,* 166 Ark., 617, 267 S. W., 353, 36 A. L. R., 1333; *People ex rel. Durham Realty Corp. v. La Fetra,* 230 N. Y., 429, 130 N. E., 601; *State v. Porter,* 94 Conn., 639; *State of Ohio v. Helvering,* 292 U. S., 360, 78 L. Ed., 1307.   When this field has been reached, the police power is severely curtailed.   "The right of a citizen to pursue any of the ordinary vocations on his own property and with his own means, can neither be denied nor unduly abridged by the Legislature, for the preservation of such right is the principal purpose of the Constitution itself.   In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic ills."   *Ex Parte Dickey,* 76 W. Va., 576, 85 S. E., 781; 2 Cooley's Constitutional Limitations, 8th Ed., p. 1329.

Referring to industrial trades, it is said in the article on Constitutional Law, 11 Am. Jur., 1048: "As to them, the power of regulation is comparatively slight, when they are conducted and carried on upon private property and private means."   In such cases the lawmaking body is usually relegated to restrictions distinctly regulative rather than prohibitive.   The principle justifying requirements of personal fitness as a condition for engaging in an occupation is a narrow exception to pertinent constitutional guaranties of personal liberty which cannot be enlarged beyond its proper scope without such violence to their purpose as would be subversive of the freedom which has been universally attributed to the American system.   It follows that there is a well recognized gap between the regulation of a business or occupation and restrictions preventing persons from engaging in them to which courts must pay careful attention.   While many of the rights of man, as declared in the Constitution, contemplate adjustment to social necessities, some of them are not so yielding.   Among them the right to earn a living must be regarded as inalienable.   Conceding this, a law which destroys the opportunity of a man or woman to earn a living in one of the ordinary harmless occupations of life by the erection of educational and moral standards of fitness is legal grotesquery.

In one respect authorities are agreed: It is necessary to a valid exercise of the police power that the proposed restriction have a reasonable

and substantial relation to the evil it purports to remedy. *Leggetts v. Baldridge,* 278 U. S., 105, 111; *Meyer v. Nebraska,* 262 U. S., 390, 67 L. Ed., 1042, 29 A. L. R., 1446. Is there anything in this business, or calling, constituting a substantial menace to the public peace, health or welfare to which such restriction has a reasonable relation? Groping in a meager field, even with the diligent aid of counsel, we are unable to find it. Looking at the dry cleaning and/or pressing business in the light of the record and briefs and applying such common knowledge of the subject as we are permitted to use, we are confirmed in our view that it is an ordinary, simple occupation which, conducted in the normal way, involves no special danger to the public peace, health, or welfare, and requiring no regimentation of personnel to keep it in safe channels. If so, exclusion of persons from its enjoyment as a means of livelihood must be attributed to some other purpose to be accomplished by the law, and is violative of constitutional guaranties.

We do not recall that it has been contended that the occupation is one requiring a background of learning or scientific training or a special degree of technical skill; the facts would not warrant such contention. Nor has it been suggested that there is any greater opportunity for fraud in the business than that found in hundreds of other ordinary callings of life.

We do not attach importance to the manner in which the results are obtained—whether the material is cleansed by water or fuller's earth or soap or gasoline, or whether smoothness and smartness has been imparted to garments by drying on a flat stone or using a sad iron, roller or press. All of these methods have been employed at one time or another in this most ancient of trades. Physical improvements in the trade have not so changed its character as to alter its relation to the public.

It is argued that the danger to workmen from the use of inflammable liquids in the cleaning process justifies the "examination" and exclusion of persons from the occupation. Such a danger is properly the subject of general State laws, but as considered here it is a matter more related to intelligence and prudence than to education. Besides, we do not apply such standards to filling station attendants, cooks, and many others exposed to similar dangers, which are comparable to a thousand others from which no ordinary occupation is entirely free. We cannot rest decision on a plausibility that might properly be regarded as a pretext to save the statute. On the contrary, it would be our duty to hold that the danger suggested might be met with less drastic regulation and, looking through the form to the substance, to declare that the objectives sought by the statute, in so far as any public purpose is concerned, are merely ostensible. *Lochner v. New York,* 198 U. S., 45, 49 L. Ed., 937.

Turning to the argument that the statute is justified as a measure intended to protect the public against fraud, we may observe that there is no business or occupation which is not likely to have its quota of dishonest men. The danger to the public comes from the character of the man and not from any unusual opportunity afforded him in the business, which is inherently amoral. Like any other business, morality is imparted to it only by the character of the men engaged in it. We would probably fail in the attempt to secure honesty as a by-product of industry through the process of starving out original sin. " 'If occasional opportunity for fraud is to be the test, then there is no reason why every grocer, every merchant, every automobile dealer, every keeper of a garage, every manufacturer, and every mechanic who deals more frequently with the public in general, and whose opportunities for fraud are far greater than those of the real estate agent or salesman, may not be put on the same basis. If that be done, then only those who, in the opinion of certain boards or the courts, have the necessary moral qualifications will be permitted to engage in the ordinary occupations of life. The result will be that all others who fail to establish their moral fitness will not only be deprived of their means of livelihood, but will become a burden either on their families and friends or the community at large. In our opinion, the right to earn one's daily bread cannot be made to hang on so narrow a thread. Broad as is the police power, its limit is exceeded when the State undertakes to require moral qualifications of one who wishes to engage or continue in a business which, as usually conducted, is no more dangerous to the public than any other ordinary occupation of life.' " *Rawls v. Jenkins,* 212 Ky., 287, 292, 279 S. W., 350.

If the act is defective, as we think it is, in failing to disclose a justifiable relation to a reasonably necessary public purpose, it is clearly a monopoly offensive to Art. I, sec. 31, of the Constitution. Socially considered, this is its most serious offense.

Monopoly, as originally defined, consisted in a grant by the sovereign of an exclusive privilege to do something which had theretofore been a matter of common right. 41 C. J., 82. The exclusion of others from such common right is still considered a prominent feature of monopoly, and the consequent loss to those excluded of opportunity to earn a livelihood for themselves and their dependents, the danger of becoming a public charge, with attendant humiliation and insecurity, has been considered the prime reason for the public policy then adopted into the Constitution. But here, the Constitution itself does not analyze—it condemns. The ordinary trades and occupations are specialized forms of service developed through the necessity of division of labor in civilized life. The Government did not create them, does not own them,

and the grant of the privileges of such trades and occupations to a limited group of citizens is "contrary to the genius of a free State and ought not to be allowed."

The set-up in this type of organization, with complete internal control and power given to interested members of the group to control admission to the trade, and with little else of importance relating to regulation, raises a suspicion as to its public purpose. Not of itself sufficient to invalidate the statute, it invites the scrutiny of the Court as to the public nature of the objectives really pursued, which might readily be found in a desire to limit the field of competition. That we have indulged this form of group organization, to the extreme limit of constitutional barriers, should be by this time convincingly evident.

There is a definite obligation of law to progress which should not be ignored in the interpretation of the Constitution. But the liberal formulæ in which this relation is usually expressed are mere abstractions when applied to the instant case. It has not been made to appear that progress has made any substantial change in the relation between those engaged in the occupation under consideration and those whom they serve that would require a reappraisal of the Constitution. The changes which have been brought to our attention are rather in the social and political viewpoint respecting the relation between society and the individual, in which the importance of personal liberty is under constant attrition, in the desire for more sweeping governmental control in private affairs and in the development of pressure groups which are unable to reach their objectives through voluntary association and, for reasons not entirely altruistic, demand the powerful aid of law. The usual symptom is an endemic desire to have the public protected against them, although the public is not sensible of any harm which they may do it, or any need of protection. This *beau geste* should not blind the Court to the fact, when it exists, that the kind of protection afforded, resting on the principle of exclusion of fellow workers, is more related to obvious benefits accruing to the group in its private character than to the merely colorable advantage to the public.

The admonition of the Constitution requiring frequent recurrence to fundamental principles is politically sound. Only in this way may we avoid a break with tradition that preserves the spirit, and often the letter of the law. One of the cardinal rules of construction as applied to the Constitution is that it must be interpreted in the light of its history. This is peculiarly demanded in this case, when we are dealing with principles which have a key position in our political set-up, and endeavoring to give them the scope and effect the framers of the Constitution, and the people to whose genius it was acceptable at the time of

its adoption, intended them to have. *Whitman v. National Bank,* 176 U. S., 559, 44 L. Ed., 587; *Steele M. & H. Co. v. Miller,* 92 Ohio St., 115, 110 N. E., 648; *Story v. Richardson,* 186 Cal., 162, 198 P., 1057. "Every constitution has a history of its own which is likely to be more or less peculiar, and unless it is interpreted in the light of this history, is liable to be made to express purposes which were never in the minds of the people agreeing to it." *Cooley, C. J., People v. Harding,* 53 Mich., 481, 19 N. W., 155. *Missouri v. Illinois,* 180 U. S., 208, 45 L. Ed., 497.

Knowledge of the sources from which these provisions of the Constitution came, and the political conditions which gave rise to them, is a part of the common learning of all English speaking peoples. There is nothing in government more dangerous to the liberty and rights of the individual than a too ready resort to the police power. It is a sufficient reference to history to recall that these restraints were the outcome of an appreciation of that fact, born of experience. They are categorically addressed to that issue. They are the product of an individualistic age, and there is little room to doubt their intended scope and purpose as affecting decision in the instant case. Resort to the police power to exclude persons from an ordinary calling, finding justification only by the existence of a vague public interest, often amounting to no more than a doubtful social convenience, is collectivistic in principle, destructive to the historic values of these guaranties, and contrary to the genius of the people who did all that was humanly possible to secure them in a written constitution. We believe that they were intended to give to the individual a larger endowment of personal liberty than could be otherwise guaranteed; a greater opportunity for initiative, and the acquisition of those interests which make for responsible citizenship. A departure from these standards may be regarded as social retrogression. No good can come to society from a policy which tends to drive its members from the ranks of the independently employed into the ranks of those industrially dependent, and the economic fallacy of such a policy is too obvious for comment.

We violate no precedent in referring to the important function these guaranties of personal liberty perform in determining the form and character of our Government. They are not accidental or unrelated. They fall into the pattern of democracy upon which our institutions are founded. In no other part of the fundamental law is caught and held the aspiration for this sort of freedom. If those whose duty it is to uphold tradition falter in the task, these guaranties may be defeated temporarily, or permanently lost through obsolescence. But it is idle to hope that the superstructure will survive its foundation stones. We learn from Biblical story that Jeremiah stood by the ruined walls of the

once glorious Jerusalem and exclaimed in amazement and anguish: "Is. it nothing to you, all ye that pass by?"

We are aware of our duty to sustain an act of the Legislature where its constitutionality may be merely a matter of doubt. *Wells v. Housing Authority,* 213 N. C., 744, 197 S. E., 693; *Gunter v. Sanford,* 186 N. C., 452, 120 S. E., 41. But this principle does not require that the defendant be made the victim of two mistakes—one by the Legislature and another by the Court. *Marbury v. Madison,* 1 Cranch (U. S.), 137, 2 L. Ed., 60; *McCray v. United States,* 195 U. S., 27, 49 L. Ed., 78; *State v. Williams, supra.* These cases are not cited *pro forma* to maintain a principle universally recognized—the power of the Court to declare an act void for unconstitutionality. They are selected because they bear upon the conditions requiring such a decision and the solemn duty resting upon the Court to uphold the Constitution according to the obligations of office.

Under the challenge which the Constitution itself makes to the prosecution, the proponents of the drastic measure of exclusion have not been able to show to the Court a single substantial evil connected with the business under which such a restriction may be justified, or any reason at all the adoption of which would not embarrass the Court. In its factual setting the case departs completely from those in which this Court has approved regulation of this kind. In this situation there does not seem to be much room for a discussion as to the rules under which the Court approaches its duty of applying the constitutional test to this act of the Legislature. Any presumptions or burdens which may exist are satisfied when the facts are laid bare to the Court and the situation is found to be wanting in those conditions and those circumstances upon which alone the power of the Legislature in its exercise of the police power must depend. Obedience to the Constitution on the part of the Legislature is no more necessary to orderly government than the exercise of the power of the Court in requiring it when the Legislature inadvertently exceeds its limitations. "It has been frequently stated, in cases where the questions are presented for judicial review, that in order to sustain legislation under the police power, the courts must be able to see that its operation tends in some degree to prevent some offense or evil or to preserve public health, morals, safety, and welfare, and that if a statute discloses no such purpose, has no real or substantial relation to these objects, or is a palpable invasion of rights secured by fundamental law, it is the duty of the courts so to adjudge and thereby give effect to the Constitution." 11 Am. Jur., p. 1087, sec. 306. In such a situation the duty of the Court is clear. "There is a fundamental canon or construction that a Constitution should receive a liberal interpretation in favor of a citizen, especially with respect to those provisions which were

designed to safeguard the liberty and security of the citizen in regard to both person and property." 11 Am. Jur., p. 670.

We hold the act to be unconstitutional, in that its application to only a part of the whole class engaged in the occupation is discriminatory, in that it is an attempted delegation of the legislative function in the creation of standards by the commissioners created in the act, and in that it attempts to exclude from an ordinary harmless occupation, upon insufficient grounds, those who are entitled under the constitutional guaranties to engage in it, and thereby creates a monopoly in the group to which such privilege is extended.

The conviction under the statute is of no effect.

The judgment is

Reversed.

STACY, C. J., concurs in result.

DEVIN, J., concurring: I concur in the decision that the statute under which the defendant was tried is inoperative and insufficient to sustain his conviction of a criminal offense. The statute transgresses constitutional limits in some respects and the rights of the appellant are thereby injuriously affected. This invokes the judicial power to declare the act void.

In our representative democracy the Legislature peculiarly represents the popular will. Its power is limited only by the restrictions placed upon it by the people themselves in the Constitution, and by the powers granted to the Federal Government in the Constitution of the United States. It is only when it is made to appear clearly that the Legislature has exceeded the limitations upon its powers that the courts will interpose to protect constitutional rights which have been invaded or threatened. The power of the Legislature to impose reasonable restrictions generally upon the conduct of persons or businesses in the public interest, and for the promotion of the general welfare, may not be questioned. If the dry cleaning business, considering the proportions to which it has grown in the life of today, is affected with a public interest, the courts may not deny the power of the Legislature to impose regulations upon it. The decision that it is affected with a public interest is primarily for the Legislature, though always open to judicial inquiry.

While this business may not be regarded as one requiring a high degree of learning or scientific knowledge, it is conceivable that there may be sound reason for promulgating general regulations about it to safeguard the public against injury from ruined clothing or from infection by the germs of disease. The courts should not attempt to set up arbitrary distinctions between what are denominated the ordinary callings of life and the learned professions in respect to the constitutional

limits upon legislative power. The courts may not undertake to say that a particular business is not affected with a public interest, contrary to legislative declaration, in the absence of a proper basis for determination. Nor should the proponents of legislation be required to show affirmatively that the particular expression of the legislative will is supported by facts and social and economic conditions sufficient to satisfy the courts. Does not the presumption that the Legislature acted within the limits of the Constitution lead to the conclusion that its declaration of policy should be followed by the courts, unless clearly shown to be unwarranted, arbitrary, or discriminatory? In the proper effort to protect individual freedom of conduct and the right to engage in a particular business free from regulation, the power of the Legislature to prescribe regulations in the public interest should not be unduly restricted, nor should there be imposed upon those seeking to uphold legislative regulation the burden of showing affirmatively that the lawmaking body has not thereby exceeded the limits upon its power fixed by the Constitution.

In the consideration of the questions raised by this appeal, as well as those of like nature which may hereafter arise, the judicial philosophy expressed by *Mr. Justice Holmes* in *Tyson v. Banton,* 273 U. S., at page 446, seems appropriate: "I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the state, and that courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular court may happen to entertain."