IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-725

Filed 16 April 2024

Wake County, No. 20 CVS 6358

NORTH CAROLINA BAR AND TAVERN ASSOCIATION; et al., Plaintiffs,

v.

ROY A. COOPER, III, in his official capacity as Governor of North Carolina, Defendant.

Appeal by Plaintiffs from an order entered 29 March 2022 by Judge James L. Gale in the Wake County Superior Court. Heard in the Court of Appeals 9 May 2023.

> *Stevens Martin Vaughn & Tadych, PLLC, by Michael J. Tadych and K. Matthew Vaughn; and Robert F. Orr, for Plaintiffs.*

> *Attorney General Joshua H. Stein, by Senior Deputy Attorney Generals Amar Majmundar and Matthew Tulchin, for Defendant.*

WOOD, Judge.

Plaintiffs appeal from the trial court's order granting summary judgment for Defendant and dismissing all their claims arising out of Defendant's Executive Order No. 141 issued in response to the COVID-19 pandemic. On 17 March 2020, Defendant issued Executive Order No. 118 closing all bars including those in restaurants. On 20 May 2020, Defendant issued Executive Order No. 141 letting some types of bars reopen with specific safety precautions but requiring private bars, including those owned by Plaintiffs, to remain closed. Defendant relied on "science and data" he

claimed created a reasonable basis to distinguish between types of bars, thus letting some reopen while keeping others closed. We have considered the information Defendant provided to the trial court to justify this distinction in the light most favorable to Defendant. Defendant's "science and data" tends to show that bars in general did present a heightened risk of COVID-19 transmission, as people normally gather, drink, and talk in bars of all sorts. We have considered the "science and data" presented by Defendant to justify the distinction between closing some types of bars and not others, but this information does not support Defendant's position, even if we consider all such information to be true. Some of the information did not exist at the time of Executive Order No. 141, so Defendant could not have relied on it. Most of the information is news articles, at best anecdotal reports of various incidents in different places around the world. None of the information addresses any differences in risk of COVID-19 transmission between Plaintiffs' bars and the other types of bars allowed to reopen. For the reasons explained below, we have determined the trial court erred when it denied Plaintiffs' summary judgment motion and dismissed Plaintiffs' claims under N.C. Const. art. I, § 1 , the "fruits of labor clause," and for denial of equal protection under N.C. Const. art. I, § 19. The trial court properly dismissed Plaintiffs' other claims, and we have also determined the trial court lacked jurisdiction to award attorneys' fees on Plaintiffs' Public Records Act claim. We therefore affirm in part, reverse in part, and remand to the trial court for further

proceedings.

## I. Background

On 10 March 2020, in response to the COVID-19 pandemic, Governor Roy Cooper ("Defendant") declared a state of emergency in North Carolina as authorized by the Emergency Management Act ("EMA"). Defendant subsequently issued executive orders for the stated purpose of mitigating the damage caused by the pandemic. Several of these orders affected certain owners and operators of bars ("Plaintiffs"), including the 17 March 2020 order which mandated the closure of *all* bars selling "alcoholic beverages for onsite consumption" (Executive Order No. 118).

On 20 May 2020, Defendant signed an executive order titled, "EASING RESTRICTION ON TRAVEL, BUSINESS OPERATIONS, AND MASS GATHERINGS: PHASE 2" (Executive Order No. 141). This order allowed restaurants to open for on-premises service under certain conditions. Section Eight of the order specifically kept bars closed: "This Executive Order solely directs that bars are not to serve alcoholic beverages for onsite consumption[.]" The order defined "bars" as "establishments that are not eating establishments or restaurants as defined in N.C. Gen. Stat. §§ 18B-1000(2) and 18B-1000(6) that have a permit to sell alcoholic beverages for onsite consumption . . . and that are principally engaged in the business of selling alcoholic beverages for onsite consumption."

In Section Five of the order, Defendant stated his reasoning in support of keeping bars closed:

> [B]y their very nature, [bars] present greater risks of the spread of COVID-19. These greater risks are due to factors such as people traditionally interacting in that space in a way that would spread COVID-19 . . . or a business model that involves customers or attendees remaining in a confined indoor space over a sustained period.

The order specifically allowed "retail beverage venues" to sell "beer, wine, and liquor for off-site consumption only." The order also specifically exempted "production operations at breweries, wineries, and distilleries" from closures.

North Carolina Bar and Tavern Association submitted a public records request to Defendant on 29 May 2020, requesting the disclosure of records related to a statement made by Defendant in a 28 May 2020 press conference that he made the decision to keep bars closed based on "data and science" and "daily briefings from doctors and healthcare experts." Defendant eventually provided the records on 18 September 2020, following the commencement of this action.

Plaintiffs filed suit against Defendant on 4 June 2020 seeking, among other things, a temporary restraining order and/or preliminary injunction preventing Defendant from enforcing Executive Order No. 141. Chief Justice Cheri Beasley of the North Carolina Supreme Court designated the matter as a Rule 2.1 Exceptional Case on 9 June 2020. Plaintiffs filed an amended complaint on 11 June 2020 and

subsequently filed a renewed motion for a temporary restraining order and/or preliminary injunction on 15 June 2020. The trial court denied the motion on 26 June 2020.

Defendant filed a motion to dismiss the complaint on 8 July 2020. On 26 October 2021, Plaintiffs filed a Second Amended Complaint bringing forth six causes of action seeking: (1) declaratory relief regarding Plaintiffs' right to earn a living under N.C. Const. art. I, § 1; (2) declaratory relief regarding Plaintiffs' right to equal protection pursuant to N.C. Const. art. I, § 19 and N.C. Gen. Stat. § 166A-19.74; (3) declaratory relief for Defendant's alleged taking of Plaintiffs' property in violation of N.C. Const. art. I, § 19; (4) declaratory relief regarding Defendant's alleged violation of the monopolies clause of N.C. Const. art. I, § 34; (5) compensation under N.C. Gen. Stat. § 166A-19.73 for Defendant's alleged taking or use of Plaintiffs' property under that statute; and (6) a fee award under N.C. Gen. Stat. § 132-9(c) for Defendant's alleged violation of the Public Records Act.

On 9 November 2021, Defendant filed a motion to dismiss all claims of the Second Amended Complaint. On 23 November 2021, Plaintiffs filed a motion for partial summary judgment as to their first, third, fifth, and sixth causes of action. The trial court denied Plaintiffs' motion for partial summary judgment and granted Defendant's motion to dismiss, thereby dismissing Plaintiffs' Second Amended Complaint on 29 March 2022.

On 27 April 2022, Plaintiffs filed a written notice of appeal pursuant to N.C. Gen. Stat. § 7A-27(b). All other relevant facts are provided as necessary in our analysis.

## II.    Procedural Posture and Standard of Review

As an initial matter, we must provide clarification on the procedural posture of this case and reasoning for how we address the trial court's order, which operates as a combined order on Defendant's motion to dismiss all six claims as well as Plaintiffs' motion for partial summary judgment on four out of six claims. Plaintiffs' cause of action pertaining to equal protection is the sole issue upon which Plaintiffs did not move for summary judgment or abandon on appeal. It is not immediately apparent which causes of action the trial court addressed under the standard for a motion to dismiss versus a motion for summary judgment.

For example, although Plaintiffs filed a motion for summary judgment as to their cause of action for compensation pursuant to N.C. Gen. Stat. § 166A-19.73, the trial court dispensed with the cause of action by stating it "should be DISMISSED." The same is true for Plaintiffs' constitutional claims. However, on the final page of the order, the trial court specifically stated, "Plaintiffs' Motion for Partial Summary Judgment should be DENIED, Defendant's Motion to Dismiss should be GRANTED, and Plaintiffs' Second Amended Complaint is HEREBY DISMISSED WITH PREJUDICE."

- 6 -

The parties appear to presume the trial court addressed Plaintiffs' causes of action according to whether Plaintiffs moved for summary judgment on a particular cause of action. For example, both Plaintiffs and Defendant present the relevant standards of review for both a motion to dismiss and a motion for summary judgment in their respective briefs, therefore presuming that the trial court addressed each cause of action under the appropriate standard. *See* Plaintiffs' Opening Brief, pp. 6–7; Defendant's Brief, pp. 10–11.

However, we must determine whether the trial court's ruling on Plaintiffs' equal protection claim, upon which they did not move for summary judgment,[1] was converted to a summary judgment ruling because of the trial court's consideration of material beyond the pleadings. The trial court did not directly address Plaintiffs' equal protection claim. Rather, it appeared to address all their constitutional claims together. After determining that Plaintiffs were not entitled to compensation pursuant to the EMA, the trial court stated, "Plaintiffs' right to compensation, if any, must then rest on a constitutional claim."

This Court has stated regarding the conversion of a Rule 12(b)(6) motion to dismiss to a Rule 56 motion for summary judgment:

> [T]he only purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the pleading against which it is directed. As a general proposition, therefore, matters

---

[1] Plaintiffs abandon their monopolies clause claim on appeal.

outside the complaint are not germane to a Rule 12(b)(6) motion. Indeed, as N.C. R. Civ. P. 12(b) makes clear, a Rule 12(b)(6) motion is converted to one for summary judgment if "matters outside the pleading are presented to and not excluded by the court":

> If, on a motion asserting the defense numbered (6), to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, *the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56,* and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 203–04, 652 S.E.2d 701, 707 (2007) (citation omitted) (emphasis in original) (quoting N.C. R. Civ. P. 12(b)).

Here, Defendant sought a dismissal of Plaintiffs' claims pursuant to Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Civil Procedure. The trial court did not address its subject matter or personal jurisdiction over Defendant regarding their constitutional claims. Rather, the trial court clearly considered Plaintiffs' claims on the basis of a motion for summary judgment, including the equal protection claim, as demonstrated by the trial court's words in its order:

> Plaintiffs' claim[s] pit[ ] their asserted right to continue to operate private bars at a profit against *Defendant's asserted need to protect the general public from a heightened risk presented by the continued operation of private bars in the COVID environment.* Plaintiffs claim that the unreasonable nature of the regulation is evident by the fact that *the Executive Orders allowed other*

*businesses that serve alcohol and present the same risks to continue to operate.* Defendant counters that *private bars by their nature present a higher risk than those other businesses to which Plaintiffs' invite comparison.*

. . .

Where *the potential for public harm is clear,* the *Responsible Citizens* [308 N.C. 255, 302 S.E.2d 204 (1983)] standard imposes a high burden on Plaintiffs to demonstrate that Defendant's response to it was excessive and therefore unreasonable. As in the case of its *equal protection inquiry,* this Court is not free to simply to substitute its own judgment *based on the same evidentiary record the Defendant considered.*

. . .

The Court has again not simply deferred to Defendant *without inquiry into the underlying evidence upon which Defendant exercised his police power.*

. . .

*Defendant has produced scientific studies and learned professional commentary* asserting that they do and that there was then a need for greater regulation of private bars than other businesses which, in part, serve alcohol and allow public gathering. The record is clear that Defendant and the professional staff on which he relied actually considered these matters when implementing his Executive Orders.

(Emphasis added). Therefore, we hold the trial court addressed all Plaintiffs' constitutional claims, including their equal protection claim, together as a ruling on a motion for summary judgment. The trial court also considered matters beyond the pleadings, including the news reports and scientific data submitted by Defendant.

Both parties cited to these documents in their briefs to this Court. Moreover, neither party has asserted that the exhibits filed with this Court were not considered by the trial court or challenged the propriety of the trial court's review of these documents. Nor have any of the parties challenged the inclusion of these materials in the Record on appeal. Accordingly, we conclude that Defendant's motion to dismiss was converted into a motion for summary judgment.

This Court has stated the following regarding the standard of review of a motion for summary judgment:

> The standard of review for summary judgment is de novo. Summary judgment is appropriate when no genuine issue of material fact exists, and a party is entitled to judgment as a matter of law. Rule 56(c) of the North Carolina Rules of Civil Procedure states that summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file[, together with the affidavits,] show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." A "genuine issue" is one that can be maintained by substantial evidence. In review of the motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.

*Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.*, 385 N.C. 250, 267, 891 S.E.2d 100, 114 (2023) (citations, quotation marks, and ellipsis omitted) (quoting N.C. R. Civ. P. 56(c)).

## III.    Analysis

Plaintiffs argue the trial court erred in denying their partial motion for summary judgment on their first, third, fifth, and sixth causes of action and erred in granting Defendant's motion to dismiss. We address each claim in turn.

## A. Taking Under the Emergency Management Act

Plaintiffs argue that Defendant's closure of their businesses entitles them to compensation pursuant to N.C. Gen. Stat. § 166A-19.73, which provides for compensation if the State has "commandeered, seized, taken, condemned, or otherwise used [their property] in coping with an emergency and this action was ordered by the Governor." N.C. Gen. Stat. § 166A-19.73(b) (2023). We note that this Court has not previously considered the compensation section of the EMA.

First, we consider how we are to review the portion of the trial court's order on summary judgment which addressed Plaintiffs' claim for compensation under the EMA. "[W]hen a trial court's determination relies on statutory interpretation, our review is de novo because those matters of statutory interpretation necessarily present questions of law." *Moore v. Proper*, 366 N.C. 25, 30, 726 S.E.2d 812, 817 (2012). Here, the trial court stated in its written order:

> [N]o matter how great their financial harm, Plaintiffs'
> statutory claims can succeed only if their claims fall within
> the EMA's scope. . . . The Court must then apply the statute
> based on its plain language as there is no court decision or
> legislative history providing further guidance. The Court
> must determine whether Plaintiffs have presented a viable
> claim that their property interest, however defined, was

"commandeered, seized, taken, condemned, or otherwise used in coping with an emergency and this action was ordered by the Governor."

Because this language demonstrates that the trial court's determination relied on statutory interpretation, we review its interpretation *de novo*.

The EMA is codified in Chapter 166A of our General Statutes. It grants our governor the authority to declare a state of emergency. N.C. Gen. Stat. § 166A-19.20(a) (2012). N.C. Gen. Stat. § 166A-19.31(b)(2) (2019) enables municipalities and counties, during a declared state of emergency, to enact ordinances prohibiting or restricting "the operation of offices, business establishments, and other places to or from which people may travel or at which they may congregate." N.C. Gen. Stat. § 166A-19.30(c)(1) (2014) enables the governor to do the same during a gubernatorially declared state of emergency if he determines "local control of the emergency is insufficient to assure adequate protection for lives and property[.]" Defendant cites to his statutorily granted authorities in, for example, Executive Order No. 118 which closed bars across our state.

Plaintiffs raise their claim pursuant to N.C. Gen. Stat. § 166A-19.73, which provides, in pertinent part, "Compensation for property shall be only if the property was commandeered, seized, *taken*, condemned, *or otherwise used* in coping with an emergency and this action was ordered by the Governor." N.C. Gen. Stat. § 166A-19.73(b) (emphasis added). The trial court presumed Plaintiffs had a legally

protected property interest and found that there was no evidentiary or legal basis to conclude their interests were "commandeered, seized, taken, condemned, or otherwise used in coping with an emergency" under N.C. Gen. Stat. § 166A-19.73(b). From a plain reading of the statute, we are constrained to agree.

"The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 137 (1990. If the words of a statute "are clear and unambiguous, they are to be given their plain and ordinary meaning." *Savage v. Zelent*, 243 N.C. App. 535, 538, 777 S.E.2d 801, 804 (2015). "In the construction of any statute, . . . words must be given their common and ordinary meaning, nothing else appearing." *Appeal of Clayton-Marcus Co., Inc.*, 286 N.C. 215, 219, 210 S.E.2d 199, 202–03 (1974). However, if the statute itself contains a definition of a word used therein, that definition controls, however contrary to the ordinary meaning of the word it may be. *See Johnston v. Gill*, 224 N.C. 638, 642, 32 S.E.2d 30, 32 (1944).

Here, because the statute does not define "taken" or "otherwise used," it is appropriate to consider, as Defendant invites us to do, the dictionary definition of *take* to determine the plain meaning of the statute. *Webster's* defines *take* as "to get by conquering; capture; seize," "to trap, snare, or catch," "to get hold of; grasp or catch," or "to get into one's hand or hold; transfer to oneself." *Take, Webster's New*

*World College Dictionary* (2010). Considering these definitions, Defendant could not have *taken* Plaintiffs' properties where Defendant, or those operating on his behalf, did not exercise physical *possession* over the land or property. Instead, Defendant prohibited Plaintiffs' use of the land, at least for the purposes of operating private bars. Therefore, we cannot conclude the operation of Executive Order No. 141 constituted a seizure or taking under the statute.

As for whether Defendant "otherwise used" Plaintiffs' property by ordering their businesses to remain closed, *Webster's* defines *use* as, "to put or bring into action or service; employ for or apply to a given purpose." *Use, Webster's New World College Dictionary* (2010). The dictionary definition, as well as the common sense notion of using something, refers to an affirmative act of employing something for a given purpose rather than an *absence* of action, such as requiring businesses to remain closed.

Moreover, we do not believe N.C. Gen. Stat. § 166A-19.73(b) indicates an intent by our legislature to define the basis for compensation under the statute as broadly as "takings" are defined for constitutional purposes. N.C. Gen. Stat. § 166A-19.73(b) is a specific statutory provision contained within a unique portion of a State statute, the EMA. If the General Assembly had wished to include government-imposed closures as a trigger for one's right to be compensated, it could have said so by including such language within N.C. Gen. Stat. § 166A-19.73(b)—but such language

- 14 -

does not appear in the statute, and it is not this Court's job to make it so. *C Invs. 2, LLC v. Auger*, 277 N.C. App. 420, 422, 860 S.E.2d 295, 297–98 (2021). Notably, the General Assembly chose to create a statutory right to compensation for some types of government action under the EMA but not others. First, the EMA authorizes the Governor, during a gubernatorially declared state of emergency and with the concurrence of the Council of State, to "procure, by . . . condemnation[ or] seizure . . . materials and facilities for emergency management." N.C. Gen. Stat. § 166A-19.30(b)(7). N.C. Gen. Stat. § 166A-19.73(b) specifically singles out condemnation and seizure as triggering one's statutory right to compensation when such action is ordered by the Governor. Second, and in contrast, some disasters may compel the Governor to order mandatory evacuations, which, by their very nature, require the *closure* of private businesses impacted by such an order. *See* N.C. Gen. Stat. § 166A-19.30(b)(7) (authorizing the Governor, during a gubernatorially declared state of emergency, to "direct and compel" evacuation). Yet, the General Assembly chose not to provide a statutory right to compensation for such closures. Third, and finally, the EMA also specifically authorizes prohibitions and restrictions on the operation of businesses during a state of emergency, without specifically identifying business closures as triggering a statutory right of compensation. *See* N.C. Gen. Stat. § 166A-19.31(b)(2).

- 15 -

Clearly, the General Assembly considered which governmental actions would trigger a statutory right to compensation and employed language which encompassed certain specific actions while excluding others. Ordering mandatory business closures is not one of those actions which triggers a statutory right of compensation under the statute as it is currently written.

Certainly, the North Carolina appellate courts have written robust "takings" jurisprudence addressing the right to just compensation for governmental takings of property. Specifically, our jurisprudence has defined "takings" in the context of the Takings Clause of the Fifth Amendment broadly to include "regulatory takings." *See, e.g., Anderson Creek Partners, L.P. v. Cty. of Harnett*, 382 N.C. 1, 876 S.E.2d 476 (2022). However, the doctrine of regulatory takings is inapposite here where the word "take" is derived from statute and where a violation of the Fifth Amendment is not alleged in this particular cause of action. For the foregoing reasons, we do not believe the same analysis employed for constitutional takings issues is appropriate in the context of the unique provisions of the EMA. Because Defendant did not *take* or *otherwise use* Plaintiffs' land during a declared state of emergency, Plaintiffs are not entitled to compensation under the EMA. Therefore, the trial court properly dismissed this cause of action.

**B. Constitutional Taking**

Having addressed Plaintiffs' "takings" claim under the EMA, we turn next to

their claim for declaratory relief, alleging Defendant took their property in violation of N.C. Const. art. I, § 19.  In Plaintiffs' Second Amended Complaint, their third cause of action alleges: "By their irrational exclusion from the reopening provisions of [Defendant's] executive orders, [P]laintiffs' revenues from their operations were completely negated, resulting in a taking of [P]laintiffs' property . . . without compensation or other remuneration."

Plaintiffs argue Defendant committed a taking of their property by shutting down their bars without just compensation.  Specifically, Plaintiffs argue *Kirby v. N.C. DOT* "is the most recent and most on point case discussing the issues before this Court in the context of whether the Defendant's actions constitute a compensable taking."  368 N.C. 847, 786 S.E.2d 919 (2016).  In *Kirby*, the plaintiffs sued the NCDOT, asserting "constitutional claims related to takings without just compensation" because, "[u]nder the Map Act, once NCDOT file[d] a highway corridor map with the county register of deeds, the Act impose[d] certain restrictions upon property located within the corridor for an indefinite period of time."  *Id.* at 849–50, 786 S.E.2d at 921–22.

As an initial matter, the court in *Kirby* noted:

> Though our state constitution does not contain an express
> constitutional provision against the "taking" or "damaging"
> of private property for public use without payment of just
> compensation, we have long recognized the existence of a
> constitutional protection against an uncompensated taking

> and the fundamental right to just compensation as so grounded in natural law and justice that it is considered an integral part of "the law of the land" within the meaning of Article 1, Section 19 of our North Carolina Constitution.

*Id.* at 853, 786 S.E.2d at 924 (quotation marks and brackets omitted).

The court in *Kirby* next determined whether NCDOT acted appropriately pursuant to its police power or whether its actions constituted a taking of land without just compensation. Specifically, at issue in *Kirby* was whether the NCDOT's actions under the Map Act constituted a "valid, regulatory exercise of the police power, not the power of eminent domain[.]" *Id.* at 852, 786 S.E.2d at 923. "Determining if governmental action constitutes a taking" for constitutional purposes "depends upon whether a particular act is an exercise of the police power or of the power of eminent domain." *Id.* at 854, 786 S.E.2d at 924 (quotation marks omitted). In exercising police power, "the government *regulates* property to prevent injury to the public." *Id.* (emphasis in original). "Police power regulations must be enacted in good faith, and have appropriate and direct connection with that protection to life, health, and property which each State owes to her citizens." *Id.* (brackets omitted). As for the power of eminent domain, "the government *takes* property for public use because such action is advantageous or beneficial to the public. . . . [T]he state must compensate for property rights taken by eminent domain." *Id.* at 854, 786 S.E.2d at 924–25 (emphasis in original).

The court in *Kirby* held that by "recording the corridor maps at issue here . . . NCDOT effectuated a taking of fundamental property rights" because:

> [t]he Map Act's indefinite restraint on fundamental property rights is squarely *outside the scope of the police power*. . . . Though the reduction in acquisition costs for highway development properties is a laudable public policy, economic savings are a far cry from the protections from injury contemplated under the police power. The societal benefits envisioned by the Map Act are not designed primarily to prevent injury or protect the health, safety, and welfare of the public. Furthermore, the provisions of the Map Act that allow landowners relief from the statutory scheme are inadequate to safeguard their constitutionally protected property rights.

*Kirby*, 368 N.C. at 855–56, 786 S.E.2d at 925–26 (emphasis added) (citation omitted).

In the present case, while Defendant's actions may be more accurately characterized as a total *prohibition* of conducting business than as a *regulation* of the operation of Plaintiffs' businesses, we cannot conclude Plaintiffs' properties were taken for *public use*. Defendant states he believed the executive orders were needed to protect the public health and to combat the spread of COVID-19, and in that way the closure of Plaintiffs' businesses was purportedly for the public benefit.[2] However, Plaintiffs' properties were never commandeered for public benefit in any manner. For

---

[2] Plaintiffs specifically state in their partial motion for summary judgment: "Plaintiffs have not and do not challenge Defendant's authority to act pursuant to North Carolina's Emergency Act but rather, challenge the *constitutionality* of Defendant's actions as applied to Plaintiffs and those similarly situated." (Emphasis added).

example, Plaintiffs' properties were not used as COVID test sites by state or local authorities. Defendant's executive orders cannot be characterized as an exercise of the power of eminent domain. Accordingly, Defendant did not commit an unconstitutional taking through the use of eminent domain.

We turn now to address whether Defendant's executive orders constituted an unconstitutional regulatory taking. Regulatory takings may be either categorical or partial takings. Specifically, as for categorical takings, there are:

> two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint. The first encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation. . . . The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land.

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S. Ct. 2886, 2893 (1992). Categorical takings are "compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Id.*

Not all takings which deprive owners of the beneficial or productive use of their land are categorical takings, however. "[T]he categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require

a more fact specific inquiry." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332, 122 S. Ct. 1465, 1484 (2002).

The fact specific inquiry is based on the factors delineated in *Penn Cent. Transp. Co. v. City of New York*:

> [(1)] The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations . . . [and (2)] the character of the governmental action [, i.e.,] . . . physical invasion [versus] when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978). Finally, we note even temporary takings are compensable. *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 318, 107 S. Ct. 2378, 2388 (1987).

In the present case, Plaintiffs do not argue Defendant's executive orders constituted a physical invasion of Plaintiffs' properties. As for a taking by means of depriving Plaintiffs of all economically beneficial or productive use of their property, Defendant's executive orders do not constitute a categorical taking under the criteria set forth in *Lucas* where there is no evidence Plaintiffs suffered the complete elimination of all value. In other words, their property still had value even if Plaintiffs did not generate profit, or revenue at all, during the COVID-19 closure. Because Defendant did not completely deprive Plaintiffs of the total value of their property, we cannot say Defendant committed a categorical regulatory taking.

- 21 -

Finally, we must address the factors set forth in *Penn Central* as discussed above. First, regarding the economic impact of the regulation and its interference with investment-backed expectations, it is manifestly clear COVID-19-era regulations devastated far too many business owners. There is no remedy that could truly compensate an owner for the labor and passion devoted to his or her business. The executive orders, however, were all explicitly limited in duration, and our legislature attempted to mitigate the impact of COVID-19 regulations "through the implementation of grant and loan programs, and mortgage and utility relief for these impacted businesses." The second factor weighs against Plaintiffs in that Defendant's actions did not constitute a physical invasion of their property but rather were part of a "public program" directed toward the "common good," notwithstanding what we have learned, in hindsight, about the effectiveness of the governmental response to COVID-19. *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S. Ct. at 2659.

For the foregoing reasons, the trial court did not err by denying Plaintiffs' claim for compensation under the theory of an unconstitutional taking pursuant to N.C. Const. art. I, § 19.

## C. Fruits of Labor

Next, we address Plaintiffs' claim that Defendant violated their right to earn a living under N.C. Const. art. I, § 1 (the "fruits of labor clause") by shutting down their businesses. The fruits of labor clause states: "We hold it to be self-evident that

all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, *the enjoyment of the fruits of their own labor*, and the pursuit of happiness." N.C. Const. art. I, § 1. (emphasis added). "This provision creates a right to conduct a lawful business or to earn a livelihood that is 'fundamental' for purposes of state constitutional analysis." *Treants Enterprises, Inc. v. Onslow Cnty.*, 83 N.C. App. 345, 354, 350 S.E.2d 365, 371 (1986).

The fruits of labor clause often has applied in cases involving licensing requirements. For example, in *Treants Enterprises, Inc.*, this Court held that a county ordinance requiring businesses "providing or selling male or female companionship" to obtain a license violated the fruits of labor clause because it "lack[ed] any rational, real, and substantial relation to any valid objective" of the county. 83 N.C. App. at 346–47, 357, 350 S.E.2d at 366–67, 373. In *State v. Harris*, our Supreme Court held licensing requirements in the dry cleaning industry violated the fruits of labor clause because of their "invasion of personal liberty and the freedom to choose and pursue one of the ordinary harmless callings of life[.]" 216 N.C. 746, 748, 751, 753, 6 S.E.2d 854, 856, 858–59 (1940). Likewise, in *State v. Ballance*, our Supreme Court held statutory licensing requirements for the practice of photography violated the fruits of labor clause as an invalid "exercise of the police power" because it "unreasonably obstruct[ed] the common right of all men to choose and follow one of the ordinary lawful and harmless occupations of life as a means of livelihood, and

- 23 -

[bore] no rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare." 229 N.C. 764, 766, 772, 51 S.E.2d 731, 732, 736 (1949).

The context of licensing requirements is not the only application of the fruits of labor clause, however. Most recently, our Supreme Court held "Article I, Section 1 also applies when a governmental entity acts in an arbitrary and capricious manner toward one of its employees." *Tully v. City of Wilmington*, 370 N.C. 527, 535–36, 810 S.E.2d 208, 215 (2018). Our Supreme Court also has held a town council's fee schedule for vehicle towing services "implicates the fundamental right to earn a livelihood" under the fruits of labor clause. *King v. Town of Chapel Hill*, 367 N.C. 400, 408–09, 758 S.E.2d 364, 371 (2014) (quotation marks omitted). In *King*, the court held there was "*no rational relationship* between regulating fees and protecting health, safety, or welfare." *Id.* at 408, 758 S.E.2d at 371 (emphasis added). The court further stated, "This Court's duty to protect fundamental rights includes preventing *arbitrary* government actions that interfere with the right to the fruits of one's own labor." *Id.* at 408, 758 S.E.2d at 371 (emphasis added).

Accordingly, the fruits of labor clause of N.C. Const. art. I, § 1 may apply when a government actor shuts down an entire industry, here the bar industry, if the restrictions imposed by the government actor bear "no rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare," or in other words, if the restrictions are arbitrary and unreasonable. *Ballance*, 229 N.C.

at 772, 51 S.E.2d at 736; *King*, 367 N.C. at 408, 758 S.E.2d at 371. Plaintiffs here are not challenging the initial closures of all bars in Executive Order No. 118; they are challenging the provisions of Executive Order No. 141 allowing some types of bars to operate but requiring their bars to remain closed. In other words, the restrictions on Plaintiffs in particular must be supported by the "data and science" cited by Defendant as justification to shut down Plaintiffs' bars, while allowing other bars located in restaurants, breweries, or other establishments to resume operations.

There is no dispute that Defendant's public interest as stated in Executive Order No. 141 was: "[F]or the purpose of protecting the health, safety, and welfare of the people of North Carolina . . . [S]lowing and controlling community spread of COVID-19 . . . [T]o lower the risk of contracting and transmitting COVID-19[.]" Rather, the dispute arises from continuing restrictions on some types of bars while allowing others to reopen. Our Constitution, and specifically the fruits of labor clause, applies even when a government official acts with the best stated purposes.

"Traditionally our courts . . . have not hesitated to strike down regulatory legislation as repugnant to the state constitution when it is *irrational and arbitrary*." *Treants Enterprises, Inc.*, 83 N.C. App. at 354, 350 S.E.2d at 371 (emphasis added). Accordingly, we must determine whether Defendant's actions were irrational and arbitrary. Exercises of State police power are constitutionally invalid when they are overbroad, unequally applied, or otherwise not carefully targeted at achieving the

stated purpose.  *Id.*; *Ballance*, 229 N.C. at 770–72, 51 S.E.2d at 735–36; *Harris*, 216 N.C. at 753, 758–61, 765, 6 S.E.2d at 859, 863–64, 866.

Here, Executive Order No. 118 shut down all bars selling "alcoholic beverages for onsite consumption."  Plaintiffs concede in their Second Amended Complaint that "some period of closure may have been reasonable and necessary[.]"  Plaintiffs argue, however, that the reasonableness and necessity ended when the State singled out Plaintiffs to remain closed in Executive Order No. 141 despite allowing restaurants to open for on-premises service under certain conditions.  We agree.

Defendant's Executive Order No. 141 allowed "eating establishments" and "restaurants," as defined in N.C. Gen. Stat. § 18B-1000(2) and (6), to reopen with certain restrictions, such as: limiting the number of customers in the restaurant, limiting the number of people sitting at a table to ten, following signage, screening, and sanitation requirements, and marking six feet of spacing in lines at high-traffic areas.  However, bars having "a permit to sell alcoholic beverages for onsite consumption . . . and that are principally engaged in the business of selling alcoholic beverages for onsite consumption"—in other words, regular bars—had to remain closed.  In Section Five of the order, Defendant provided the following reasoning in support of keeping bars closed:

> [B]y their very nature, [bars] present greater risks of the spread of COVID-19.  These greater risks are due to factors such as people traditionally interacting in that space in a

way that would spread COVID-19 . . . or a business model that involves customers or attendees remaining in a confined indoor space over a sustained period.

The order specifically allowed "retail beverage venues" to sell "beer, wine, and liquor for off-site consumption only" and specifically exempted "production operations at breweries, wineries, and distilleries" from closures.

Plaintiffs, however, specifically allege that they were as "equally capable . . . of complying with the reduced capacity, distancing, increased sanitation, and other requirements set forth" as other establishments that were permitted to reopen. We therefore must determine whether the forecast of evidence presented to the trial court presented a genuine issue of material fact that would preclude summary judgment, or if that forecast of evidence failed to present a genuine issue of material fact and Plaintiffs should prevail on summary judgment in their favor. *See Value Health Sols., Inc.*, 385 N.C. at 267, 891 S.E.2d at 114.

We must consider the "science and data" submitted by Defendant to the trial court as justification for the differentiation in restrictions placed on Plaintiffs' bars as opposed to the other types of bars allowed to resume operation "in the light most favorable" to Defendant to determine if there is a genuine issue of material fact as to whether Defendant acted irrationally and arbitrarily when he allowed restaurants and eating establishments to reopen but kept Plaintiffs' bars closed. *Id.*; *Treants Enterprises, Inc.*, 83 N.C. App. at 354, 350 S.E.2d at 371. In other words, we must

attempt to square Defendant's reasoning for precluding Plaintiffs' bars from the opportunity to reopen under the specified guidelines that, for example, restaurants had, with their stated ability to follow the same guidelines as restaurants. Although we view the evidence in the light most favorable to Defendant for purposes of summary judgment, we must also review the scientific evidence that was before the trial court, which acts in its capacity as the gatekeeper of expert testimony, to determine whether it is sufficiently reliable. *See Taylor v. Abernethy*, 149 N.C. App. 263, 272–73, 560 S.E.2d 233, 239 (2002).

The trial court noted that Defendant relies upon his contention that "private bars by their nature present a higher risk than those other businesses to which Plaintiffs' invite comparison." The trial court further stated that it has "not simply deferred to Defendant without inquiry into the underlying evidence upon which Defendant exercised his police power." It concluded that, concerning the purported heightened risk of COVID-19 infections in private bars compared "to other businesses which allowed alcohol consumption and public gathering[,] Defendant has produced scientific studies and learned professional commentary asserting that they do and that there was then a need for greater regulation of private bars than other businesses which, in part, serve alcohol and allow public gathering."

We are unable to arrive at the same conclusion. Our careful review of the Record does not reveal the existence of any scientific evidence demonstrating

Plaintiffs' bars, as opposed to the bars located in other establishments serving alcohol, posed a heightened risk at the time Executive Order No. 141 was issued. Even if we assume the materials submitted by Defendant address higher risks of COVID-19 infections in locations where alcohol is served and people gather, these materials do not include any distinctions between different types of bars. Defendant points us to Executive Order No. 188 in which he states that "studies have shown that people are significantly more likely to be infected with COVID-19 if they have visited a bar or nightclub for on-site consumption." First, we note that Executive Order No. 188 was issued 6 January 2021, and Executive Order No. 141 was issued 20 May 2020, meaning that this purported scientific rationale for closing private bars but no other types of bars was over seven months delayed. Second, Defendant cannot reasonably rely on his own assertion within an executive order as though it were itself a scientific study. Next, Defendant references a Washington Post article dated 14 September 2020 which states that there is a "statistically significant national relationship between foot traffic to bars one week after they reopened and an increase in cases three weeks later" compared to reopening restaurants which, according to cellphone data, is not as strongly correlated with a rise in cases. A news article, however, is not a scientific study nor is it apparent that it was based on a scientific study. Defendant presented to the trial court two other news articles. One is a National Public Radio article titled "How Bars Are Fueling COVID-19 Outbreaks,"

which is an interesting opinion piece but does not link to a scientific study (or, pursuant to our review, even refer to a study). The other is an article titled "Over 100 COVID-19 cases linked to outbreak at Tigerland Bars in Baton Rouge," which reports on a COVID-19 outbreak at a Louisiana bar, but the article says nothing about the heightened risk bars purportedly pose compared to other establishments serving alcohol. "Research" such as these news articles could be conducted by private citizens utilizing Internet search engines. In fact, many of the documents in the Record were gathered from Internet searches as evidenced by the tags and links at the bottom of the printed pages. Excepting one, none of the documents purport to be scientific studies.[3]

Defendant does point to one scientific study that is in the Record, a study dated 28 September 2020 which states the following:

> [P]ost-opening surges seemed to be strongly correlated with the opening of bars. Regardless of the timing or sequence of other relaxations, opening bars was followed 11-12 days later by surging infection rates.
>
> . . .
>
> Bars: The effect of closing and opening bars became evident in those states that opened their economies in stages[.]

---

[3] Some studies and articles regarding COVID-19 in general are included, but these simply address what COVID-19 is, how it affects people generally, and other basic information about the disease. We do not discount this information and we consider it accurate, at least for purposes of review on summary judgment, but this information does not address bars of any sort or how COVID-19 may be spread in various types of establishments.

> Although most states closed bars and restaurants simultaneously during their early shutdowns, some opened them at different times during the re-openings. We found that, regardless of other relaxations, new infections surged beginning 11-12 days after bars were opened, and fell once again about 8 days after bars were re-shuttered. This suggests that closing (and re-opening) settings that might not be conducive to social distancing has more impact on new infection rates than would opening other types of businesses (dog groomers, markets, hardware stores; even restaurants).

Again, this study does not differentiate between various types of bars; it would apply equally to the bars Defendant allowed to resume operations as to Plaintiffs' bars. Moreover, another significant problem with Defendant's reliance on this study is that Executive Order No. 141, which closed private bars but allowed restaurants to reopen, was issued 20 May 2020, and this study was not posted until 28 September 2020. Defendant could not have relied upon this study and, therefore, at the time the executive order was issued, could only speculate that bars might pose a greater risk than restaurants where alcohol is also consumed.

Overall, the articles and data submitted by Defendant entirely fail to address any differences in the risk of spread of COVID-19 between the bars he allowed to reopen and Plaintiffs' bars which remained closed. Defendant has not demonstrated any logic in the complete closure of bars for on-premises service when the same measures that allowed other types of bars, such as hotel and restaurant bars, to open could have been applied to the operation of those businesses. Plaintiffs assert that

- 31 -

they were as "equally capable . . . of complying with the reduced capacity, distancing, increased sanitation, and other requirements set forth for those" other establishments allowed to reopen. Allowing restaurants and some types of bars to reopen with restricted capacity while simultaneously prohibiting Plaintiffs' bars from reopening in like manner was arbitrary and capricious. Defendant has not produced any forecast of evidence demonstrating Plaintiffs' bars would be unable to comply with the same restrictions placed upon other types of bars allowed to reopen. We conclude, then, Defendant failed to present any "data and science" tending to show a rational basis for allowing some types of bars to resume operations while keeping other bars closed. The continued closure of Plaintiffs' bars while permitting other similar establishments to reopen under certain conditions violated Plaintiffs' right to enjoy the fruits of their own labor from the operation of their respective businesses. Therefore, the unequal treatment of Plaintiffs compared to other similar establishments was illogical and not rationally related to Defendant's stated objective of slowing the spread of COVID-19. Accordingly, we vacate the trial court's denial of summary judgment of Plaintiffs' claim under the fruits of labor clause of N.C. Const. art. I, § 1, and we remand this cause of action to the trial court for reconsideration in light of our above analysis.

Regarding Plaintiffs' claim for relief for a violation of the fruits of labor clause, our Supreme Court has stated of a defendant's violation of constitutional rights:

[T]he common law provides a remedy for the violation of plaintiff's constitutionally protected right of free speech. What that remedy will require, if plaintiff is successful at trial, will depend upon the facts of the case developed at trial. It will be a matter for the trial judge to craft the necessary relief. As the evidence in this case is not fully developed at this stage of the proceedings, it would be inappropriate for this Court to attempt to establish the redress recoverable in the event plaintiff is successful . . . . Various rights that are protected by our Declaration of Rights may require greater or lesser relief to rectify the violation of such rights, depending upon the right violated and the facts of the particular case. When called upon to exercise its inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right, however, the judiciary must recognize two critical limitations. First, it must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power. Second, in exercising that power, the judiciary must minimize the encroachment upon other branches of government—in appearance and in fact—by seeking the least intrusive remedy available and necessary to right the wrong.

*Corum v. UNC Through Bd. of Governors*, 330 N.C. 761, 784, 413 S.E.2d 276, 290–91 (1992) (citation omitted).

**D. Attorneys' Fees**

Plaintiffs next argue the trial court erred in dismissing their claim for attorneys' fees associated with the delay in producing public records. Under N.C. Gen. Stat. § 132-9, a "party seeking disclosure of public records who substantially prevails [shall] recover its reasonable attorneys' fees if attributed to those public

records." N.C. Gen. Stat. § 132-9(c) (2023).

N.C. Gen. Stat. § 132-9(a) provides:

> Any person who is denied access to public records for purposes of inspection and examination, or who is denied copies of public records, may apply to the appropriate division of the General Court of Justice for an order compelling disclosure or copying, and the court shall have jurisdiction to issue such orders *if the person has complied with* [N.C. Gen. Stat. §] 7A-38.3E.

(Emphasis added).

N.C. Gen. Stat. § 7A-38.3E (2023), in turn, provides: "Subsequent to filing a civil action under Chapter 132 of the General Statutes, a person shall initiate mediation pursuant to this section. Such mediation shall be initiated no later than 30 days from the filing of responsive pleadings with the clerk in the county where the action is filed." N.C. Gen. Stat. § 7A-38.3E(b). Specifically addressing the initiation of mediation, N.C. Gen. Stat. § 7A-38.3E(c) provides: "[t]he party filing the request for mediation shall mail a copy of the request [for mediation form] by certified mail, return receipt requested, to each party to the dispute." The statute further prescribes the method for selecting the mediator and provides for the mediation procedure. N.C. Gen. Stat. § 7A-38.3E(c), (d).

Here, the trial court found it had jurisdiction because "Plaintiffs requested initiation of mediation pursuant to [N.C. Gen. Stat.] § 7A-38.3E when presenting their claim," and the trial court referenced paragraph 12 of Plaintiffs' Second

Amended Complaint ("Plaintiffs respectfully request the initiation of mediation of this dispute pursuant to N.C. Gen. Stat. § 7A-38.3E . . . or, alternatively, for the mediation requirement to be dispensed with pursuant to N.C. Gen. Stat. § 7A-38.3E(d)").

Defendant argues the trial court lacked jurisdiction because although Plaintiffs requested mediation in their complaint, they did not initiate or participate in mediation, and the requirement to mediate was never waived. We agree.

N.C. Gen. Stat. § 132-9(a) focuses on granting a court jurisdiction to issue orders compelling disclosure ("the court shall have jurisdiction to issue such orders *if the person has complied with* [N.C. Gen. Stat. §] 7A-38.3E") (emphasis added). Here, Plaintiffs requested documents from Defendant and then requested initiation of mediation in their Second Amended Complaint. However, neither party took any action to initiate mediation. Merely requesting mediation in a complaint does not constitute initiating mediation. Otherwise, parties could bypass the statutory scheme, which specifically states a party "shall initiate" mediation, by merely requesting mediation in a complaint and then applying to a court for an order compelling disclosure, rendering any mediation requirement meaningless. A party must do more than merely request mediation in a complaint in light of the specific requirements contained in N.C. Gen. Stat. § 7A-38.3E(c), which requires the appointment of a mediator whether by parties' agreement or by appointment of the

senior resident superior court judge if the parties do not agree. N.C. Gen. Stat. § 7A-38.3E(e) permits waiver of mediation, but it assumes a mediator has been chosen because it requires the parties to inform the mediator of their waiver in writing. N.C. Gen. Stat. § 7A-38.3E(e). Here, there is no Record evidence that a mediator was ever appointed or that the parties waived mediation.

For these reasons, we hold Plaintiffs did not "initiate mediation" within the meaning of N.C. Gen. Stat. § 7A-38.3E(a) which would have granted the trial court jurisdiction under N.C. Gen. Stat. § 132-9(a), (requiring a party to comply with N.C. Gen. Stat. § 7A-38.3E). Therefore, the trial court lacked jurisdiction to issue an order compelling disclosure of the records. N.C. Gen. Stat. § 132-9(a). Accordingly, the trial court erred in concluding it had jurisdiction to consider and rule on Plaintiffs' Public Records Act claim.

## E. Equal Protection

Plaintiffs contend Defendant violated their right to equal protection under N.C. Const. art. I, § 19, which states:

> No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

Specifically, Plaintiffs allege a violation of their right to equal protection in their

second cause of action: "Plaintiffs' discriminatory exclusion from [Defendant's] executive orders allowing similar businesses to operate while disallowing the Plaintiffs' businesses have denied the Plaintiffs equal protection afforded by . . . Art. I, sec. 19 [of the] North Carolina Constitution. . . . Plaintiffs have been deprived of their right to equal protection under the law."

We note courts generally determine a level of scrutiny at the outset of an equal protection analysis. "Before embarking upon an equal protection analysis, we must first determine the level of scrutiny to apply." *Stephenson v. Bartlett*, 355 N.C. 354, 377, 562 S.E.2d 377, 393 (2002). If the government action "affects the exercise of a fundamental right" or disadvantages a suspect class, strict scrutiny applies; conversely, if the classification does neither of those things, a rational basis test is appropriate. *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180, 594 S.E.2d 1, 15 (2004).

Here, Defendant's executive orders affected Plaintiffs' right to earn a living, as discussed in Section C of our analysis, and therefore implicated a fundamental right under the North Carolina Constitution. Plaintiffs allege a violation of equal protection by asserting Defendant blocked their ability to earn a living by prohibiting the reopening of their businesses under the exact same standards and opportunity given to other businesses. N.C. Const. art. I, § 19. This is especially true where Plaintiffs specifically assert their ability and willingness to have complied with all of the same protocols implemented by other businesses but were denied that

- 37 -

opportunity.

It is illogical and arbitrary to attempt to achieve Defendant's stated health outcomes by applying different reopening standards to similarly situated businesses that could have complied with those standards. In other words, if restaurants serving alcohol could operate at fifty percent capacity and keep groups six feet apart with both food and alcohol at the customers' tables, Defendant has failed to present any forecast of evidence of any reason bars would not be able to do the same with alcohol service. Therefore, Executive Order No. 141 was underinclusive for not allowing bars to participate in the same phased reopening as restaurants that serve alcohol. The unequal treatment of Plaintiffs had the effect of denying their fundamental right to earn a living by the continued operation of their businesses.

Accordingly, we conclude Defendant violated Plaintiffs' right to "the equal protection of the laws" under N.C. Const. art. I, § 19.

## IV.  Conclusion

Because Defendant did not "take" Plaintiffs' property within the statutory meaning in N.C. Gen. Stat. § 166A-19.73, Plaintiffs are not entitled to compensation under that statute. Defendant did not commit a "taking" of Plaintiffs' property under our constitution which would have entitled them to recovery for an unconstitutional taking. However, we hold the trial court erred in denying Plaintiffs' partial motion for summary judgment for liability as to the fruits of their labor and equal protection

claims. We affirm the trial court's determination that Plaintiffs were not entitled to an award of attorneys' fees under the Public Records Act.

We remand this matter to the trial court for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges STROUD and GRIFFIN concur.