IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-671

Filed 1 April 2026

Forsyth County, No. 23CVS002108-330

KIMBERLY DUNCKEL and FAIRYTALE FARM ANIMAL SANCTUARY, Plaintiffs,

v.

CITY OF WINSTON-SALEM, NORTH CAROLINA; ALLEN JOINES, in his official capacity as City Mayor; DENISE D. ADAMS, BARBARA H. BURKE, ROBERT C. CLARK, JOHN C. LARSON, JEFF MACINTOSH, KEVIN MUNDY, ANNETTE SCIPPIO, JAMES TAYLOR, JR., in their official capacities as City Council members; and CHRIS MURPHY, in his official capacity as Director of Planning & Development Services Department, Defendants.

Appeal by plaintiffs from order entered 28 February 2025 by Judge Troy J. Stafford in Forsyth County Superior Court. Heard in the Court of Appeals 11 February 2026.

*Institute for Justice, by Caroline Grace Brothers and Renée D. Flaherty, and Akerman LLP, by Bryan G. Scott and Jasmine Pitt, for plaintiffs-appellants.*

*Marissa A. West and Anargiros N. Kontos, Assistant City Attorneys, City of Winston-Salem, for defendants-appellees.*

DILLON, Chief Judge.

Plaintiffs Kimberly Dunckel and Fairytale Farm Animal Sanctuary appeal following the entry of the trial court's order granting Defendants' motion for summary judgment on Plaintiffs' constitutional claims. Essentially, the trial court concluded that the City of Winston-Salem (the "City") did not violate Plaintiffs' constitutional

rights by prohibiting Plaintiffs from operating an animal sanctuary on property zoned by the City as residential. We conclude the trial court did not err in granting summary judgment and affirm.

## I. Background

In 2017, Plaintiff Dunckel and her family purchased a 3.33-acre property in the City. *Prior to purchasing the property*, Plaintiff Dunckel learned the property was zoned residential. A few years later in 2021 she began to operate Fairytale Farm Animal Sanctuary, a nonprofit organization, on the property. Plaintiff Sanctuary housed various farm and small animals (usually around 60 to 70 animals at a time) and hosted different volunteer activities, educational opportunities, and fundraising events, some of which had several hundred guests.

In January 2023, the City received an anonymous complaint prompting the City to investigate the property, after which the City concluded Plaintiffs were operating a nonprofit animal sanctuary in an area zoned for single-family residential purposes (RS-9). Thus, after email correspondence and a second site visit, the City informed Plaintiffs could seek a home via a home occupation permit for the nonprofit *or* Plaintiffs could "close the nonprofit and have the animals as . . . personal pets, but absolutely not both." Specifically, the City contends Plaintiffs' use of the property as an animal sanctuary was *not* permitted under the City's Unified Development Ordinance. *See, e.g.,* Winston-Salem/Forsyth County, N.C., Uniform Development Ordinances §§ 5.1.1, .3(A) (2023) (hereinafter the "UDO"].

The City directed Plaintiffs to cease sanctuary operations, and Plaintiffs voluntarily complied. Due to Plaintiffs' voluntary compliance, Defendants did not issue a formal Notice of Violation ("NOV").

As the basis for its decision, the City interpreted its UDO to prohibit Plaintiff Sanctuary entirely because "animal sanctuaries" are not a use listed in the UDO and uses similar to "animal sanctuaries" are not allowed in RS-9 zoning districts. *See* UDO § 5.1.1. Under the UDO, when a proposed use is not listed in the Principal Use Table, the Director of Inspections must classify the use "with that use in the Table most similar" to the unlisted use and then enforce the requirements applicable to that use. *Id.* § 5.1.3(A). To that end, because no formal NOV was issued prior to or during this litigation, City officials *unofficially* considered Plaintiffs' use to be comparable to that of an animal shelter or possibly an indoor or outdoor kennel. In any event, Plaintiffs concede the closest existing use under the UDO would be an animal shelter. Animal shelters are prohibited in RS-9 zones. *Id.* § 5.1.1.

Plaintiffs sued, alleging Defendants' decision to shut down their nonprofit animal sanctuary violated the Fruits of Their Own Labor Clause, Law of the Land Clause, and the Equal Protection Clause of the North Carolina Constitution. After conducting discovery, both parties moved for summary judgment. On 28 February 2025, after a hearing on the matter, the trial court entered an order granting Defendants' motion and denying Plaintiffs' motion. Plaintiffs timely appealed.

## II.    Analysis

Plaintiffs assert the trial court erroneously granted Defendants' motion for summary judgment on Plaintiffs' Fruits of Their Labor, Law of the Land, and Equal Protection claims.

### A.  Standard of Review

We review issues of standing de novo as they pose a question of law. *Town of Midland v. Harrell*, 385 N.C. 365, 370 (2023).  "This Court reviews a trial court's . . . award of summary judgment de novo."  *Willowmere Cmty. Ass'n, Inc. v. City of Charlotte*, 370 N.C. 553, 556 (2018).

A trial court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C.G.S. § 1A-1, Rule 56(c).  "[A]ll inferences of fact . . . must be drawn against the movant and in favor of the [non-movant]." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (ellipses in original and citation omitted). When there is a genuine dispute of material fact, a motion for summary judgment is properly denied. *Id.*

### B.  Standing

Prior to reaching the merits of Plaintiffs' appeal, we begin with the issue of whether Plaintiffs have standing to bring this action under our Declaratory Judgment Act (the "DJA"), *see* G.S. 1-253 *et. seq*.  Plaintiffs, quoting our Supreme

Court's decision in *Taylor v. City of Raleigh*, 290 N.C. 608, 620 (1976), essentially contend they have standing under the DJA because they have "a specific personal and legal interest in the subject matter affected by the zoning ordinance" and were "directly and adversely affected thereby[,]" notwithstanding that the City never issued a formal NOV. That language was recently cited by our Court in *Gardner v. Richmond Cnty.*, 297 N.C. App. 751, 756 (2025) and *Camp Carefree, Inc. v. Rockingham Cnty.*, 920 S.E.2d 221, 230 (N.C. Ct. App. 2025). We believe, however, this line of cases does not resolve the present standing issue.

In *Byron v. Synco Properties, Inc.*, this Court explained that there are three standing tests relevant to zoning challenges. 258 N.C. App. 372, 375–76 (2018). Relevant to this appeal is the third test, which involves challenges to a zoning statute's or ordinance's constitutionality.[1] *Id.* at 376. In these challenges, "a [claimant] must produce evidence that he has sustained an injury or is in immediate danger of sustaining an injury as a result of enforcement of the challenged ordinance." *Id.* at 380 (quoting *Grace Baptist Church v. City of Oxford*, 320 N.C. 439, 444 (1987)).

In *Grace Baptist* decided by our Supreme Court, the city-defendant enacted an ordinance in 1970 that required parking areas to be paved. 320 N.C. at 441. In 1972,

---

[1] The first test, or the *Taylor* test, permits a claimant to bring a declaratory judgment action to challenge a *rezoning ordinance* if the claimant "has a specific personal and legal interest in the subject matter affected by the zoning ordinance and who is directly and adversely affected thereby." *Byron*, 258 N.C. App. at 375 (emphasis removed) (quoting *Taylor*, 290 N.C. at 620). The second test confers standing to claimants who seek to challenge a zoning *statute*, and it "requires that the statute directly and adversely affect the [claimant]." *Id.* (citation omitted).

the church-plaintiff obtained a special use permit and constructed its church in a residential zone. *Id.* Despite the special use permit's requirement that the building comply with city ordinances, the church's parking lot was unpaved. *Id.* The church then brought a declaratory judgment action, claiming in part that the city had violated the church's constitutional right to equal protection by selectively enforcing the ordinance against the church. *Id.* at 441–42. In its answer, the city admitted it was seeking injunctive relief to prevent the church from using its property in violation of the ordinance. *Id.* at 442, 444.

Though the city had not yet formally cited the church for violating an ordinance when the church filed its action, our Supreme Court concluded the church had standing. *Id.* at 444. The Court explained "to challenge the constitutionality of an ordinance, a [claimant] must produce evidence that he has sustained an injury or is in immediate danger of sustaining an injury as a result of enforcement of the challenged ordinance." *Id.* In concluding the church had standing, the Court cited the city's answer, which prayed for injunctive relief that "ordered [the church] to immediately cease use of its property" until compliant and the trial court's finding which, in essence, stated the city intended and currently intends to enforce the ordinance. *Id.*

We conclude Defendants' answer and uncontroverted evidence found in the record establish Plaintiffs were similarly "in immediate danger of sustaining injury." *See Grace Baptist*, 320 N.C. at 444. While Defendants never issued a formal NOV,

Defendants admitted the following in their answer: "Kimberly Dunckel was told that she could not host events for the Animal Sanctuary on the property or a[n] [NOV] would be issued[.]" Defendants' internal communications and communications to Plaintiffs likewise establish an imminency of injury. After the City's staff visited Plaintiff Dunckel's property, Plaintiff Dunckel began corresponding with the staff by email; in those emails the staff made clear "the current use of the property will have to stop operating[,]" and specifically, Plaintiffs "would not be able to run/operate an animal rescue/sanctuary[,]" because of the RS-9 zoning designation. Similarly, in a memo to Defendant Mayor and Defendants City Council Members, the memo explained "[t]he nonprofit is in violation of the [UDO] for operating as a commercial business in a residential area[,]" but "[t]he [C]ity hasn't issued a[n] [NOV] because the [S]anctuary is working with them[ ]"—a position confirmed by Defendant Chris Murphy, the City's 30(b) witness and the City's Director of Planning and Development Services Department. Finally, Defendant Murphy also explained that had Plaintiffs not filed the present lawsuit and if they continued to operate the sanctuary the City would have issued Plaintiffs an NOV.

Thus, the evidence and pleadings indicate Defendants viewed Plaintiffs as in violation of the UDO and informed Plaintiffs that the current use of the property was required to cease. Between Defendants' answer and other evidence in the record, Defendants intended to enforce the UDO but refrained from enforcement only because Plaintiffs voluntarily cooperated. Therefore, following our Supreme Court's

rationale in *Grace Baptist*, we hold Plaintiffs have standing under the DJA because Defendants "intend[] to enforce the provision" thereby placing Plaintiffs "in immediate danger of sustaining injury." *See Grace Baptist*, 320 N.C. at 444.

Defendants, however, contend any claim under the DJA has been foreclosed by recent enactments by our General Assembly, contending that Plaintiffs may only bring any challenge under Chapter 160D, which does not allow a claim to be brought until after a final NOV has been sent. *See, e.g.,* An Act to Clarify, Consolidate, and Reorganize the Land-Use Regulatory Laws of the State, S.L. 2019-111, 2019 N.C. Sess. Laws 424; An Act to Complete the Consolidation of Land-Use Provisions into One Chapter of the General Statues as Directed by S.L. 2019-111, as Recommended by the General Statutes Commission, S.L. 2020-25, 2020 N.C. Sess. Laws 152. Indeed, at the trial court below, the parties disagreed about whether G.S. 160D-1403.1 superseded Plaintiffs' claims under the DJA (G.S. 1-253 *et. seq.*).

General Statute 160D-1403.1 does provide that a person with standing may bring an action for declaratory relief to challenge the constitutionality of a land use regulation, but can do so *only after* "a final and binding decision" has been made by the city. Specifically, subsection (a) provides that a civil action may be brought by an owner to challenge the constitutionality of a land development regulation:

> Except as otherwise provided in this section for claims involving questions of interpretation, in lieu of any remedies available under G.S. 160D-405 or G.S. 160D-108(h), *a person with standing*, as defined in subsection (b) of this section, *may bring an original civil action* seeking

*declaratory relief*, injunctive relief, damages, or any other remedies provided by law or equity, *in superior court* or federal court *to challenge the enforceability, validity, or effect* of a local land development regulation for any of the *following claims*:

(1) The ordinance, either on its face or as applied, is unconstitutional.

(2) The ordinance, either on its face or as applied, is ultra vires, preempted, or otherwise in excess of statutory authority.

(3) The ordinance, either on its face or as applied, constitutes a taking of property. . . .

N.C.G.S. § 160D-1403.1(a) (emphasis added).  Subsection (b), however, explains that

an owner has standing under G.S. 160D-1403.1 only after a final, binding decision

has been made:

Any of the following criteria provide standing to bring an action under this section:

(1) *The person has an ownership*, leasehold, or easement *interest in*, or possesses an option or contract to purchase *the property that is the subject matter of a final and binding decision made by an administrative official charged with applying or enforcing a land development regulation*.

(2) The person was a development permit applicant before the decision-making board whose decision is being challenged.

(3) The person was a development permit applicant who is aggrieved by a final and binding decision of an administrative official charged with applying or enforcing a land development regulation.

*Id.* § 160D-1403.1(b) (emphasis added).

Section 160D-1401 provides that actions authorized under G.S. 160D-1403.1 may be brought pursuant to the DJA:

> Challenges of legislative decisions of governing boards, including the validity or constitutionality of development regulations adopted pursuant to this Chapter, and *actions authorized by* G.S. 160D-108(h) or (i) and *G.S. 160D-1403.1 may be brought pursuant to Article 26 of Chapter 1 of the General Statutes.* The governmental unit making the challenged decision shall be named a party to the action.

(Emphasis added). Further, Section 160D-1404 provides that "[e]xcept as expressly stated, this Article does not limit the availability of civil actions otherwise authorized by law[,]" which arguably would include an owner's right to seek a declaratory judgment under the DJA (G.S. 1-253 *et. seq.*).

Our Supreme Court has instructed that "[s]tatutes are to be read harmoniously in a way that renders them internally compatible, not [contradictorily]." *Terry v. Pub. Serv. Co. of N.C., Inc.*, 385 N.C. 797, 805–06 (2024) (citations omitted). Relatedly, we employ a presumption *against* rendering a statute superfluous. *Fearrington v. City of Greenville*, 386 N.C. 38, 53 (2024) ("We presume . . . that the General Assembly does not adopt superfluous legislation." (citation omitted)).

We note that nowhere in G.S. 160D-1401 or -1403.1 is there an express statement of limitation on "the availability of civil actions" that are otherwise permitted by law. *See* G.S. 160D-1404 ("Except as expressly stated . . . .").

Accordingly, we hold that Plaintiffs have standing under *Grace Baptist*, and G.S. 160D-1403.1 does not preclude Plaintiffs from bringing their actions under the

Declaratory Judgment Act.

### C.  Fruits of Their Labor and Law of the Land Clauses

Having resolved the standing issue, we turn to the merits of Plaintiffs' appeal.

First, we consider Plaintiffs' argument that the trial court erred in granting Defendants' motion for summary judgment on Plaintiffs' Fruits of Their Labor and Law of the Land claims.  We disagree.

The first section of our state constitution provides:  "We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, *the enjoyment of the fruits of their own labor*, and the pursuit of happiness."  N.C. Const. art. I, § 1 (emphasis added).  The italicized portion, aptly named the "Fruits of Their Labor Clause," guarantees our citizenry's fundamental right to earn a living.  *See Howell v. Cooper*, 388 N.C. 71, 80 (2025) ("Our state constitution enshrines the fundamental right to conduct a lawful business or to earn a livelihood as one of the first principles of freedom." (citations and internal marks omitted)).

Likewise, this fundamental right is also guaranteed by Article I, Section 19 of our state constitution.  *Id.*  That section, also known as the Law of the Land Clause, provides: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land."  N.C. Const. art. I, § 19.

When a claimant asserts state action has burdened his or her fundamental

- 11 -

right to earn a living, we analyze whether the action is valid under both above-mentioned clauses with the same test. *Howell*, 388 N.C. at 79. Recently, our Supreme Court clarified this test in *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418 (2024). The Court explained that state action passes constitutional muster when the state demonstrates it is "reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm." *Id.* at 424 (citation omitted). Practically, though, "[t]his test involves a 'twofold' inquiry: '(1) is there a proper governmental purpose for the statute, and (2) are the means chosen to effect that purpose reasonable?'" *Id.* (quoting *Poor Richard's v. Stone*, 322 N.C. 61, 64 (1988)).

In answering the first prong of the inquiry, we must ascertain the actual purpose of the state action, whether that purpose be the one "proffered by the government" or the one offered by the claimant after establishing "the State's asserted purpose is not the true one[.]" *N.C. Bar & Tavern Ass'n v. Stein*, 388 N.C. 149, 160 (2025) (quoting *Ace Speedway*, 386 N.C. at 424–25). Once we determine the actual purpose, we ask whether the "actual purpose is a proper governmental purpose." *Id.* A purpose is proper when it " 'addresses the public interest' and 'promote[s] the accomplishment of a public good, or . . . prevent[s] the infliction of a public harm.'" *Id.* (alterations and ellipses in original) (citation omitted).

After establishing that the actual purpose is a proper governmental purpose, we must assess whether "the means chosen to effect that purpose [are] reasonable[,]" which is "a fact-intensive analysis" that "assess[es] two fact-specific questions[.]" *Ace*

*Speedway*, 386 N.C. at 426 (citation omitted). The first question asks, "how effective is the state action at achieving the desired public purpose and, [the] second, how burdensome is that state action to the targeted businesses[?]" *Id.*; *see also Poor Richard's*, 322 N.C. at 66 ("The means used must be measured by balancing the public good likely to result from their utilization against the burdens resulting to the businesses being regulated."). Finally, after analyzing the benefits and burdens of the state action, "[t]he analysis then becomes 'a question of degree'—given all the options available to the state to advance the governmental purpose, was it reasonable for the state to choose this approach, with its corresponding benefits and burdens?" *Id.* (citation omitted).

We begin with the questions of what Defendants' actual purpose is and whether it is a proper government purpose. *See Ace Speedway*, 386 N.C. at 424–25; *N.C. Bar & Tavern*, 388 N.C. at 160. The UDO expressly states that its purpose "is to promote the health, safety, and general welfare of the residents within the zoning jurisdiction[.]" UDO § 2.2.2. With respect to residential districts and specifically RS-9 (single-family residential) zones, Defendants' purpose in preventing certain commercial uses in those districts is to "preserve the residential character of neighborhoods to promote health, safety, and general welfare."[2]

---

[2] Even certain residential uses are not permitted in areas zoned RS-9. For instance, the following *residential* uses are not even permitted: duplexes, townhouses, twin homes, multifamily homes, certain classes of manufactured homes, manufactured housing developments, boarding or

Plaintiffs do not argue this purpose is not Defendants' actual purpose, nor do Plaintiffs argue Defendants' purpose is not a proper government purpose; rather, Plaintiffs argue Defendants' actions fail constitutional scrutiny because the burden to Plaintiffs outweighs any benefit to Defendants given that the UDO's regulation is ineffective at achieving Defendants' purpose. *See, e.g., Howell*, 388 N.C. at 81 ("[T]his case seems to focus on the second prong: whether the [regulation was] a reasonable means to effect the purpose of [preserving residential character].")

Turning to prong two, we must analyze whether Defendants' enforcement of the UDO against the Sanctuary is a reasonable way of achieving Defendants' goal of preserving their residential neighborhoods' character. *See Ace Speedway*, 386 N.C. at 426; *Howell*, 388 N.C. at 80–81; *N.C. Bar & Tavern*, 388 N.C. at 160.

By regulating and preventing Plaintiffs' commercial use in Plaintiffs' neighborhood, Defendants' goal of preserving the residential character of RS-9 districts is achieved. By hosting events—some of which required guests to pay for tickets and others that hosted several hundred guests—and operating the nonprofit as Plaintiffs did previously and seek to do in the future, Plaintiffs have engaged and will engage in a non-residential, commercial use. Stated differently, by virtue of operating the nonprofit, a commercial entity, Plaintiffs are altering the residential nature of their RS-9 neighborhood. And by enforcing the UDO in this case,

---

rooming houses, certain family group homes, fraternities or sororities, and life care communities. UDO § 5.1.1.

Defendants worked to preserve the character and integrity of the specific RS-9 district's residential character by eliminating a commercial use from the district. In light of this, Defendants' enforcement is very effective at achieving their "desired public purpose." *Ace Speedway*, 386 N.C. at 426.

However, Plaintiffs contend that the enforcement is not effective because there is evidence tending to show Plaintiffs did not negatively impact traffic, noise, and odors nearby Plaintiffs' property. Plaintiffs' attempts to analyze the discrete segments of a commercial use overlooks the fact Plaintiffs are still using the property in a commercial manner even if some of the negative impacts are not present based on the factual record before us.

Next we are required to "determine[ ] the extent of the burden the state action places on the targeted businesses." *Howell*, 388 N.C. at 81. It is evident that Plaintiffs are burdened—because of the UDO Plaintiffs are unable to operate the Sanctuary *at Plaintiff Dunckel's property*. Additionally, Plaintiffs are further burdened because moving the Sanctuary to another location would be costly. Despite this burden, however, uncontroverted facts also indicate that Plaintiffs' animal sanctuary, whether classified as an animal shelter or as an indoor or outdoor kennel, would be permitted in certain commercial and industrial districts. Thus, while Plaintiffs are burdened, Defendants have not prohibited Plaintiffs from operating at all, but rather only in certain zoning districts. Indeed, Plaintiffs held a few off-site events after Defendants informed Plaintiffs the commercial use of the property

needed to cease, and Plaintiffs are permitted to operate the office aspects of the nonprofit from Plaintiff Dunkel's home if they applied for a home occupation permit. *See Poor Richard's*, 322 N.C. at 66 (explaining that the upheld statute did not "regulate all aspects of a sales facility[ ]" but "only those transactions which involve military property[ ]").

Finally, we must "decide whether, given all the options available, it was reasonable for [Defendants] to choose the selected approach." *Howell*, 388 N.C. at 81 (citation omitted). When a claimant asserts their fundamental right to earn a living has been infringed, the applicable Fruits of Their Labor and Law of the Land test does not require that the means be the best method of achieving the state's goal; rather, the means chosen must be "reasonably necessary." *See Ace Speedway*, 386 N.C. at 424. We believe that, in light of other options, it was reasonable for Defendants to prevent the operation of the Sanctuary at Plaintiff Dunckel's property. While burdensome to Plaintiffs, enforcement here aids in Defendants' accomplishment of their goal. By permitting Plaintiffs to operate as they previously did, potentially having hundreds of guests present at Plaintiffs' property on a single day, or even permitting Plaintiffs to operate at a much smaller scale (as Plaintiffs seek to do now), Defendants would still be allowing an otherwise unauthorized commercial use within a RS-9 zoning district, thereby frustrating their ultimate goal. Moreover, as mentioned above, Plaintiffs are permitted to operate at Plaintiff Dunckel's property if they comply with the applicable home occupation permit

requirements and Plaintiffs can operate in an appropriate zoning district.

We also note that Defendants' enforcement of the UDO is not the same as state action described in other Fruits of Their Labor and Law of the Land cases in which the opinions draw a distinction between government action regulating a business and instances where the government excludes or prohibits individuals from engaging in a business altogether.

As stated in *Howell*, " 'the [State's] police power is severely curtailed' when the government endeavors to 'exclude persons from engaging in [an ordinary business or occupation].' " *Howell*, 388 N.C. at 81 (alterations in original) (quoting *State v. Harris*, 216 N.C. 746, 758 (1940)). "It follows that there is a well[-]recognized gap between the regulation of a business or occupation and restrictions preventing persons from engaging in them to which courts must pay careful attention." *Harris*, 216 N.C. at 759 (striking down licensing requirement for dry cleaners); *see also Town of Clinton v. Standard Oil Co.*, 193 N.C. 432, 435–36 (1927) (ordinance prohibiting the operation of additional gas stations within the town's fire district held unconstitutional); *State v. Ballance*, 229 N.C. 764, 772 (1949) (photography licensing regime held unconstitutional as the scheme does not merely regulate but unreasonably curtails one's right to pursue their calling); *Roller v. Allen*, 245 N.C. 516, 523–26 (1957) (unconstitutional tile contracting license scheme); *Howell*, 388 N.C. at 76 (reciting language from this Court's *Howell* opinion describing the executive orders that directly or indirectly closed the plaintiffs' businesses as a "blanket prohibition . . . of

an entire economic sector[ ]"); *Proctor v. City of Jacksonville*, 296 N.C. App. 665, 675–76 (2024) (complaint sufficiently alleged Fruits and Law of the Land claims because of an allegation that the city "enacted the UDO" "to protect brick-and-mortar restaurants from competition[ ]"); *but see Poor Richard's*, 322 N.C. at 66 ("Further, the statute does not seek to regulate all aspects of a sales facility. It regulates only those transactions which involve military property."). As we have stated, although Plaintiffs are burdened, they are not burdened to the point of out-right prohibition. Nor is there a system in place that works to exclude Plaintiffs from the animal sanctuary business: Defendants have told Plaintiffs that Plaintiffs are unable to operate *at Plaintiff Dunckel's property*, Defendants have not told Plaintiffs that Plaintiffs are forbidden from operating at all.

Finally, we believe our Supreme Court's decision in *Kinney v. Sutton* is persuasive at the very least, if not controlling of the present issues. There, a city adopted zoning ordinances that created residential, business, and industrial zoning districts. *Kinney v. Sutton*, 230 N.C. 404, 405 (1949). In the newly created residential district where the plaintiff's property was located the ordinances did not allow commercial uses, but did allow religious uses, educational uses, social uses, small scale agricultural uses, health care uses, non-conforming uses at the time of enactment, and "[c]ommercial activities, if carried on by members of the immediate family, and not more than two employed persons[.]" *Id.* at 405–07. After the city required the plaintiff to shut down and the plaintiff administratively appealed, the

plaintiff argued the ordinance: (1) was not a proper exercise of the city's police power; (2) "constitute[d] arbitrary, unreasonable, and discriminatory restriction" on his property rights; and (3) violated the Law of the Land Clause and the Fourteenth Amendment in that the ordinance "deprive[d] [the plaintiff] of his property without due process . . . ." *Id.* at 408, 410.

Our Supreme Court dismissed the plaintiff's first argument on appeal before turning to the second and third issues. *Id.* at 410–411. In holding the ordinances were not "arbitrary, unreasonable and discriminatory restrictions[,]" the Court reasoned the ordinances were "aptly phrased to secure their object[:] to establish and preserve a restricted residential district free from substantial commercial and industrial activities." *Id.* at 411. Notably, the Court raised no issue with the fact that religious, educational, social, and health care uses were permitted in residential districts. Dealing with the other carve-outs, the Court explained such exemptions were reasonable, had a "sound basis[,]" and, for the limited commercial operations, were inherently different from "unlimited commercial and industrial activities." *Id.* at 411. Finally, because the ordinances were a proper exercise of the city's police power and because they were "not arbitrary, unreasonable, or discriminatory in character," our Supreme Court held the ordinances did not unconstitutionally deprive the plaintiff of his property without due process. *Id.* at 412.

Relevant here, despite not being a case that involved the fundamental right to earn a living, *Kinney* instructs this Court that a zoning ordinance may still be "aptly

phrased to secure [its] object" by establishing and preserving a "restricted residential district free from substantial commercial and industrial activities[ ]" *even though* certain non-residential uses are permitted with the residential district. *Id.* at 411. What this means for Plaintiffs' case is the fact that some non-residential uses are permitted does not render the statute unconstitutional—the ordinance's purpose is still being achieved.

Expanding on this point, we are not persuaded by Plaintiffs' comparison to other non-residential uses that are permitted in RS-9 districts. Plaintiffs attempt to liken language in *Ace Speedway* to the proposition that Defendants' enforcement of the UDO is not reasonable. Specifically, Plaintiffs point to where our Supreme Court stated:

> "[T]his would mean that the State sought to achieve this governmental purpose by issuing an abatement order shutting down a single business while choosing to ignore many others presenting identical risks to the public. This is a particularly ineffective means of achieving the asserted governmental interest, while simultaneously imposing a tremendous burden on Ace Speedway."

*Ace Speedway*, 386 N.C. at 427. Essentially, Plaintiffs contend we should hold Defendants' enforcement of the UDO to be unconstitutional because the other non-residential uses exist in RS-9 districts and these uses generate negative impacts that alter a district's residential character. Although the UDO allows certain non-residential or commercial uses (such as schools, churches, and home day care centers), Defendants' enforcement of the UDO still achieves Defendants' goal of

preserving the district's residential character.

More to the point, the non-residential uses that are permitted (assuming the appropriate permit or review is obtained) are not the rule but rather the exception. On the Principal Use Table, 24 out of 138 listed non-residential uses are permitted in RS-9.[3] UDO § 5.1.1. Being that such a small number of non-residential uses are actually permitted, Plaintiffs' case differs factually from *Ace Speedway* because we are not confronted by a situation where the state's justification for shutting down a single business is severely undermined by the widespread operation of many other businesses presenting a similar risk. *Ace Speedway*, 386 N.C. at 427.

Thus, because we hold, under *Ace Speedway*, enforcement is constitutionally permissible, as it is a reasonable means of achieving Defendants' goal, we therefore do not seek to question the expediency of the permitted uses as it relates to the accomplishment of Defendants' goal. *See Harris*, 216 N.C. at 758 ("The mere expediency of legislation is a matter for the Legislature, when it is acting entirely within constitutional limitations, but whether it is so acting is a matter for the courts . . . .").

---

[3] By use category: three "agricultural uses," zero "retail and wholesale trade uses," one "business and personal service use," three "recreational uses," eleven "institutional and public uses," zero "manufacturing and mining" uses, and six "transportation and utilities" uses. UDO § 5.1.1. More specifically, only one use between the "retail and wholesale trade uses" and "business and personal service uses" categories, the latter category being the one that indoor and outdoor kennels fall in, and only eleven uses of the "institutional and public uses" category, the category animal shelters fall under, are permitted, despite those three categories comprising substantial portion of the listed non-residential uses. *Id.*

In summary, after applying to applicable test enunciated in *Ace Speedway*, we hold the trial court did not err in granting Defendants' motion for summary judgment with respect to Plaintiffs' Fruits of Their Labor and Law of the Land claims.

### D. Equal Protection

Finally, Plaintiffs contend Defendants violated their rights under our state constitution's Equal Protection Clause. Again, we disagree.

Our Equal Protection Clause states: "No person shall be denied the equal protection of the laws[.]" N.C. Const. art I, § 19. "When the claim involves neither a suspect class nor a fundamental right, . . . [a] 'rationality' standard is employed." *N.C. Bar & Tavern*, 388 N.C. at 163 (citation omitted). However, it should be noted that despite the right to earn a living being a *fundamental right*, our Supreme Court has consistently applied rational basis to Equal Protection claims involving that right. *Id.* (citing *Duggins v. N.C. State Bd. of Certified Pub. Acct. Exam'rs*, 294 N.C. 120, 131 (1978)). Accordingly, we will apply rational basis review to Plaintiffs' Equal Protection claims even though the right to earn a living is fundamental.

When rational basis review applies in the Equal Protection context, our state constitution permits the government to "classify . . . activities when there is [a] reasonable basis for such classification and for the consequent difference in treatment under the law." *Responsible Citizens in Opposition to Flood Plain Ordinance v. City of Asheville*, 308 N.C. 255, 267–68 (1983) (citation omitted). Thus, "[c]lassifications are not offensive to the Constitution 'when the classification is based on a reasonable

distinction and the law is made to apply uniformly to all the members of the class affected.' " *Poor Richard's*, 322 N.C. at 67 (citation omitted); *see also White v. Pate*, 308 N.C. 759, 766–67 (1983) ("The 'rational basis' standard merely requires that the governmental classification bear some rational relationship to a conceivable legitimate interest of government."). "In essence, '[e]qual protection requires that all persons similarly situated be treated alike.' " *Holmes v. Moore*, 384 N.C. 426, 437 (2023) (alteration in original) (citation omitted). " '[P]ersons who are in all relevant respects alike' are 'similarly situated.' " *Clayton v. Branson*, 170 N.C. App. 438, 457 (2005) (citation omitted). However, "[t]he reasonableness of a particular classification is a question of law for determination by the court." *A-S-P Associates v. City of Raleigh*, 298 N.C. 207, 226 (1979).

We conclude there is a reasonable basis for the classification and difference in treatment of the Sanctuary; and, therefore, Defendants' action does not offend Article I, Section 19's Equal Protection Clause. Essentially, Plaintiffs compare themselves to three different groups: (1) residents with personal pets, (2) home day care centers, and (3) schools and churches. We conclude it was reasonable to differentiate between Plaintiffs and the listed groups. With respect to the first group, the difference is readily apparent, and as a result, there is a "reasonable distinction." While residents with "personal pets" may have the same type and theoretically the same number of animals as Plaintiffs, those residents are not engaging in a non-residential, commercial use like Plaintiffs. As to groups two and three, it is conceivable that,

despite seeking to maintain the district's residential character, certain uses which are integral to residential life should still be permitted. Schools, places of worship, and home day care centers are all integral to the everyday lives of residents, and thus it is reasonable for these uses to be permitted. Notably, two of these uses are also protected by our state constitution's Declaration of Rights. *See* N.C. Const. art I, §§ 13, 15 (fundamental rights of religious liberty and education, respectively).

Accordingly, the trial court properly granted summary judgment in favor of Defendants on Plaintiffs' Equal Protection claims.

### III.    Conclusion

Considering the foregoing, we conclude Plaintiffs have standing to challenge the enforcement of the UDO. We further hold that the trial court did not err in granting Defendants summary judgment on Plaintiffs' Fruits of Their Labor, Law of the Land, and Equal Protection claims. We affirm the trial court's order.

AFFIRMED.

Judges FLOOD and FREEMAN concur.